**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Richard F. LeFEVOUR,
Defendant-Appellant.**

No. 85–2494.

United States Court of Appeals,
Seventh Circuit.

Argued June 13, 1986.

Decided Aug. 14, 1986.

Robert S. Bailey, Chicago, Ill., for defendant-appellant.

Before CUMMINGS, Chief Judge, POSNER, Circuit Judge, and GORDON, Senior District Judge.*

POSNER, Circuit Judge.

After a seven-week trial, a jury convicted Richard LeFevour, a former state court judge in Chicago, of having violated the "RICO" statute (Racketeer Influenced and Corrupt Organizations), 18 U.S.C. § 1962(d), committed mail fraud, 18 U.S.C. § 1341, and filed false income tax returns, 26 U.S.C. § 7206(1), during a 14-year career of bribe taking. He was sentenced to 12 years in prison.

Long the chief judge of the Cook County traffic court, LeFevour is a principal figure in the "Greylord" scandal that has engulfed a number of judges, lawyers, and policemen in Chicago. See, e.g., *United States v. Devine*, 787 F.2d 1086 (7th Cir. 1986); *United States v. Murphy*, 768 F.2d 1518 (7th Cir.1985); *United States v. Conn*, 769 F.2d 420 (7th Cir.1985). The *Murphy* opinion describes some of his schemes, see 768 F.2d at 1524-27, thus allowing us to be brief. They fall in three periods. In the first, which lasted from 1969 to the beginning of 1981, he accepted bribes to dismiss drunk-driving cases. His cousin, Jimmy LeFevour (the principal witness for the prosecution), a policeman assigned to the traffic court, was his "bagman" for these bribes. Lawyers gave Jim-

my cash to get their cases dismissed (or the defendant placed on supervision, the mildest sanction for drunk driving), and Jimmy would turn the cash over to the judge after deducting a small pourboire for himself.

In the second (and overlapping) period covered by the charges, 1976 to 1982, the judge accepted bribes for quashing parking tickets. Some of the bribes took the form of free use of leased cars in exchange for dismissing parking tickets for which the leasing company was liable; others, of free use of copying machines supplied by a copier seller whose service personnel had received many parking tickets. In this period the judge also took cash bribes for dismissing charges against "scofflaws." The practice in Cook County is to issue an arrest warrant to anyone who has ten or more unpaid parking tickets. Arthur McCauslin and Lawrence McLain, who, like Jimmy LeFevour, were policemen attached to the traffic court, would serve these warrants. According to their testimony Judge LeFevour proposed and they acceded to a scheme whereby they offered to settle the scofflaw's case for half the fine. If the scofflaw agreed to settle, the money was paid over to the judge, who dismissed the charges and recalled the warrant.

The last period, which ran from 1981 to 1983, began with LeFevour's promotion to chief judge of the first municipal district. A magazine reported "hustling" at two of the courts under the judge's new jurisdiction. A "hustler" is a lawyer who hangs around the courthouse waiting for persons who have been arrested and have posted a cash bond to arrive for an appearance in the case. The hustler accosts the person and offers to represent him in exchange for the bond refund to which an arrested person is entitled at the end of the case. Judge LeFevour sent Jimmy to these courts to put an end to hustling, but once there Jimmy was approached by lawyers who offered to pay the judge to be allowed to continue. The offer was relayed to the judge, who accepted it, and "the Club" was

* Hon. Myron L. Gordon, of the Eastern District of Wisconsin, sitting by designation.

formed, whose five members paid a total of $2,500 a month ($500 to Jimmy, the rest to the judge) for the privilege of hustling.

Apart from testimony by the bagmen and other witnesses to the alleged bribes, the prosecution relied heavily on a reconstruction of Judge LeFevour's finances, showing that he spent much more money than he received from all known legitimate sources.

1. The first ground of the appeal is that the district judge should have allowed the defense to try to prove that it was LeFevour's practice to dismiss parking charges on request. The government argues with great but misdirected vigor that the defense just wanted to prove either that LeFevour had a good character or that he didn't *always* dismiss parking charges because paid to do so. LeFevour's counsel points out that he had to prove the practice of dismissal on request in order to lay a foundation for his principal defense, which was that McCauslin and McLain had shaken down the parking violators, pocketed the money, and then gone to Judge LeFevour and said, "Please dismiss these charges"— and the judge had obliged because it was his practice to do so. Since the judge did not take the stand, this indirect method was the only means the defense had to show that there might be an innocent explanation (provided the bagmen's testimony was disbelieved) for the undoubted corruption that had occurred.

█ There is nothing wrong with the argument; the problem is with the specific offer of proof. Detailed though it is (seven pages, plus a two-page letter attached as an exhibit), it fails to mesh with the defense theory. Most of the witnesses whose projected testimony is summarized in the offer are law enforcement officers (or other public employees, including an alderman) who had asked Judge LeFevour to quash tickets that they or other law enforcement officers had received—not tickets issued to private citizens, as in the cases that McCauslin and McLain testified about. The two witnesses who were private citizens (a businessman and a social worker) gave the judge detailed explanations of why their tickets should be quashed. In no case was an arrest warrant recalled. No judge is so corrupt that he dismisses a case only when paid to do so, and all the offer of proof shows is that Judge LeFevour sometimes dismissed cases for other reasons—but in circumstances different from those of the dismissals that according to McCauslin and McLain had been induced by bribes. The relevance of the offered proof to the charges against LeFevour is so tenuous that the district judge was entitled to conclude that its probative value would be clearly outweighed by its effect in confusing the jury by extending an already very long trial. Fed.R.Evid. 403.

2. The defense wanted the jury to hear a portion of a tape recording that McCauslin made after he began cooperating with the government's investigation of Judge LeFevour. McCauslin, while wired for sound, had a conversation in which he told LeFevour that a grand jury had subpoenaed McCauslin and he asked LeFevour what he should do. LeFevour told him not to worry and to get in touch with his lawyer. LeFevour also asked him who his lawyer was and McCauslin answered that it was Seymour Vishny and suggested that he and LeFevour should communicate with each other through Vishny. LeFevour acknowledged the suggestion (according to McCauslin's testimony—the tape recording was garbled at this point), and the conversation ended. But the tape did not end, and after leaving LeFevour, McCauslin had a discussion with the FBI agents who had wired him. He told them he had "put on his best scare act" with LeFevour. Since the tape was still running, this statement was recorded. The defense wanted this part of the tape played to the jury too, but the trial judge ruled it inadmissible because it would confuse the jury and was not relevant to impeaching McCauslin's testimony, McCauslin having admitted making the "scare act" statement. LeFevour argues that this ruling was error. He relies on Fed.R.Evid. 106, which provides that

"when a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." See *United States v. Southland Corp.*, 760 F.2d 1366, 1378 (2d Cir.1985).

In ruling that the rest of the tape could not be placed in evidence because it was inadmissible, the judge implicitly treated Rule 106 as merely regulating the order of proof. So the rule is often described, see, e.g., *United States v. Costner*, 684 F.2d 370, 373 (6th Cir.1982); 1 Weinstein's Evidence ¶ 106[02], at p. 106–12 (1985), but the description is misleading. If otherwise inadmissible evidence is necessary to correct a misleading impression, then either it is admissible for this limited purpose by force of Rule 106, the view taken in 21 Wright & Graham, Federal Practice and Procedure § 5072, at p. 344 (1977), or, if it is inadmissible (maybe because of privilege), the misleading evidence must be excluded too. The party against whom that evidence is offered can hardly care which route is taken, provided he honestly wanted the otherwise inadmissible evidence admitted only for the purpose of pulling the sting from evidence his opponent wanted to use against him. Rule 106 was not intended to override every privilege and other exclusionary rule of evidence in the legal armamentarium, so there must be cases where if an excerpt is misleading the only cure is to exclude it rather than to put in other excerpts. But this is not a matter we need pursue further here, as we do not think there was any danger of a misleading impression.

The government's purpose in placing the tape recording in evidence was to show that LeFevour knew that McCauslin's lawyer was Seymour Vishny; this was relevant in light of evidence (discussed next) connecting Vishny with LeFevour's efforts to conceal his corrupt practices. If the government had excised portions of the conversation between McCauslin and Le-Fevour and as a result had conveyed a misleading impression, Rule 106 would have entitled LeFevour to play the rest of the taped conversation to the jury—and to do so right after the government had played its portion of the tape ("contemporaneously"), so that the jury would not be left with a false impression that might prove indelible. But the government played the whole conversation; what it left out was a separate conversation between McCauslin and the agents. If the separate conversation had been on a different tape, the weakness of LeFevour's argument under Rule 106 would be transparent—though not just because of the accident of there being two reels of tape rather than one; a letter and the reply to it are a unit for purposes of Rule 106, see 21 Wright & Graham, *supra*, § 5078, at p. 372 and n. 6. But there is no logical connection between the two conversations that McCauslin had, at least given the very limited use that the government made of the first one. The capacity of a tape, floppy disc, compact disc, or other recording medium is irrelevant to the purposes of Rule 106. The qualifying words, "ought in fairness," show that the duty to place "any other part" of the recorded statement or any other "recorded statement" in evidence is not absolute; obviously, the admission of one recorded statement could not require the admission of every other such statement in the party's possession. See, e.g., *United States v. Marin*, 669 F.2d 73, 84–85 (2d Cir.1982).

The purpose of the "completeness" rule codified in Rule 106 is merely to make sure that a misleading impression created by taking matters out of context is corrected on the spot, because of "the inadequacy of repair work when delayed to a point later in the trial." Notes of Advisory Comm. on Proposed Rule 106. An example would be accusing the Biblical David of blasphemy for saying, "There is no God," his full statement being, "The fool hath said in his heart, there is no God." *Trial of Algernon Sidney*, 9 Howell's State Trials 818, 868–69 (K.B. 1683). We are far from that paradigmatic case here. No misleading impression

was corrected by stopping the tape before McCauslin told the agents that he had "put on his best scare act." If he had scared LeFevour into saying something incriminating, there might be some point to allowing the jury to hear McCauslin admit having tried to manipulate the conversation. But really the only point of placing the recording of the conversation in evidence was to show that LeFevour knew of Vishny's representation of McCauslin and acceded to the latter's suggestion that Vishny be their go-between; and to that purpose the talk of a "scare act" was irrelevant. If the purpose of the scare act was to get LeFevour to make incriminating statements, it failed.

Although an argument can be made that McCauslin's inability to frighten LeFevour into making incriminating statements is evidence that LeFevour was innocent, the argument is too tenuous to require the admission of the end of the tape. LeFevour himself argues only that the conversation with the agents should have been put into evidence for the sake of completeness. But the only thing the conversation with LeFevour showed—that McCauslin would be dealing with LeFevour through Vishny—was complete in itself, without reference to the "scare act." See *United States v. Garrett*, 716 F.2d 257, 271–72 (5th Cir. 1982).

3. Shortly after the taped conversation (which took place in April 1982), Judge LeFevour, according to Jimmy LeFevour's testimony, told Jimmy that he had met Vishny and that he wanted Jimmy to act as his intermediary with Vishny. Jimmy met Vishny and later told Judge LeFevour that Vishny wanted $50,000 to represent McCauslin and that McCauslin wanted a job in Florida. The judge told Jimmy to tell Vishny to represent McCauslin free of charge; Jimmy refused and told the judge to tell Vishny himself. The FBI found in Vishny's wastebasket a note Vishny wrote to McCauslin during this period, which stated, "Don't be offended. I have been asked to do this as a condition of getting whatever help you need. The parties are agreeable to what you want. The final proposal

should be made within 10 days." McCauslin testified that Vishny wrote rather than spoke this because he was afraid his office was bugged. The note was admitted into evidence as the statement of a coconspirator (Vishny) of Judge LeFevour. The defense argues that it should not have been admitted, because a conspiracy to cover up a prior conspiracy is separate from that conspiracy.

 It is true that "a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment. . . . [E]very conspiracy will inevitably be followed by actions taken to cover the conspirators' traces. Sanctioning the Government's theory [of subsidiary conspiracy] would for all practical purposes wipe out the statute of limitations in conspiracy cases, as well as extend indefinitely the time within which hearsay declarations will bind co-conspirators." *Grunewald v. United States*, 353 U.S. 391, 402, 77 S.Ct. 963, 972, 1 L.Ed.2d 931 (1957). But that is not to say that the statements of conspirators whose job is to prevent detection of the conspiracy are inadmissible. One of the reasons for punishing conspiracy separately from the substantive offense that the conspirators have agreed to commit is that a conspiracy makes detection harder by enabling members to be assigned different duties, including preventing detection. The member of a gang of bank robbers who is posted as a lookout outside the bank is a member of a conspiracy to rob banks. "[R]epainting a stolen car would be in furtherance of a conspiracy to steal." *Id.* at 405, 71 S.Ct. at 974. Here as in *United States v. Xheka*, 704 F.2d 974, 986 (7th Cir.1983), "the acts of concealment further[ed] the object of the conspiracy—obtaining money—and result[ed] in lengthening its duration." Vishny's note was written in 1982, when LeFevour was still receiving bribes from the hustlers' club. The jury could infer from the taped conversation between McCauslin and LeFevour

about Vishny, and from Jimmy's testimony about his conversation with the judge about Vishny, that Judge LeFevour had conspired with Vishny to keep McCauslin quiet in order to be able, without interference from the FBI agents who were investigating McCauslin, to continue taking bribes; and thus that the note had prolonged the conspiracy. And there was no need to charge a conspiracy in order to allow the introduction of a co-conspirator's statement, provided the conspiracy was proved, *United States v. Gil*, 604 F.2d 546, 549 (7th Cir.1979); 4 Weinstein's Evidence, *supra*, ¶ 801(d)(2)(E)[01], at pp. 801–229 to 801–230, which it was.

■ 4. Despite testimony from Jimmy LeFevour, McCauslin, and McLain that Judge LeFevour had dismissed parking charges on many occasions, the government was able to put into evidence fewer than 50 of the traffic court computer printouts which showed the dismissals with the name of the dismissing judge. Concerned that the jury might expect documentary evidence to back up these witnesses' testimony—an expectation encouraged by defense counsel's asking McCauslin on cross-examination whether LeFevour "never failed to put his initials so that those documents could be traced back to him?" and receiving an affirmative answer—the government asked the judge for, and was granted, permission to prove that shortly after the FBI's investigation of the traffic court had become public, a lawyer for the City of Chicago had removed the printouts in question, and that he had never returned them. The district judge told the jury that the only purpose of the evidence was to account for the missing documentation, not to blame Judge LeFevour for its disappearance. Given the misleading impression created by the cross-examination of McCauslin, the evidence was proper.

5. Several witnesses who testified for the government did so under agreements whereby the government promised either to recommend lighter sentences or not to use their testimony against them, provided they testified fully and truthfully. Early

in the examination of each such witness the prosecutor asked him whether he was testifying under a plea agreement or grant of immunity and what that signified. The defense argues that this was an effort to bolster the credibility of witnesses whose credibility had not yet been put in issue, by implying that they would testify truthfully out of fear that otherwise their bargain with the government would be revoked.

To bolster a witness's credibility in advance is improper. See Fed.R.Evid. 608(a)(2). It not only has the potential for extending the length of trials enormously, but asks the jury to take the witness's testimony on faith; it may therefore reduce the care with which jurors listen for inconsistencies and other signs of falsehood or inaccuracy. But asking a witness whether he is testifying by agreement is not likely to bolster his credibility. If anything it is likely to have the opposite effect, by imputing a motive for the witness's testifying as the prosecution wants him to testify, regardless of the truth; few jurors would believe that the government would retaliate against a witness because he had lied *for* the government. If the government does not ask the witness whether he is testifying by agreement, the defense is very likely to do so on cross-examination.

■ May the government pull the sting of cross-examination by asking the question on direct examination? We have twice upheld the propriety of this practice, see *United States v. Craig*, 573 F.2d 513, 519 (7th Cir.1978); *United States v. Hedman*, 630 F.2d 1184, 1198–99 (7th Cir.1980); see also *United States v. McNeill*, 728 F.2d 5, 14 (1st Cir.1984); *United States v. Henderson*, 717 F.2d 135, 137–38 (4th Cir.1983), and we are not persuaded to depart from these holdings. The practice is justified by the same considerations that underlie the "completeness" rule codified in Fed.R.Evid. 106. A party ought to be able to extract the complete testimony of his witness, including the essential circumstances bearing on its believability, rather than forced to leave gaping holes to be poked at by his opponent. This is particularly true in the

matter of a plea or immunity agreement, since the jury is bound to wonder from the outset why someone should be testifying to all these things that damn him along with the defendant, and having wondered may be shocked or puzzled to discover the reason for the first time on cross-examination. A trial is not just combat; it is also truth-seeking; and each party is entitled to place its case before the jury at one time in an orderly, measured, and balanced fashion, and thus spare the jury from having to deal with bombshells later on. It is on this theory that defense counsel, in beginning their examination of a defendant, will often ask him about his criminal record, knowing that if they do not ask, the prosecutor will do so on cross-examination. See, e.g., *United States v. Fountain*, 768 F.2d 790, 795, modified on other grounds, 777 F.2d 345 (7th Cir.1985) (per curiam). What is sauce for the goose is sauce for the gander.

But there is a wrinkle in this case. The witnesses about whose testimony LeFevour is complaining were employed either by the automobile leasing company that gave LeFevour the use of cars without charge or by the copier company that gave him the use of copiers without charge; they were not the bagman witnesses, such as McCauslin. With regard to the bagmen, Judge LeFevour's defense was that they were the only people bribed and that he had had nothing to do with their shaking down scofflaws and hustlers. He would have had every incentive to use their plea agreements (none testified under an immunity agreement) to impeach their testimony. But the defense position with regard to the auto and copier witnesses was different. There was no denial that LeFevour had received the cars and copiers free of charge; the denial was that they were a quid for a quo consisting of quashing parking tickets; instead, the defense argued, they were promotional gifts. To have harped on these witnesses' immunity agreements (none testified under a plea agreement) in cross-examination would simply have underscored the witnesses' consciousness of their guilt, thus undermining

the argument that LeFevour's transactions with them had been entirely lawful. Nor could the jury conclude from the immunity agreements that these witnesses were likely to lie for the government; for if they told the complete truth they would be in no legal jeopardy, unlike the confessed bagmen, whose only hope was to reel in a bigger fish for the government. Thus, the argument concludes, in introducing the immunity agreements the government was not providing information that the jury needed to evaluate the credibility of these witnesses; it was, purely and simply, bolstering that credibility.

 Although this argument has some force, it overlooks the fact that, without knowledge of the immunity agreements, the jury might wonder why these witnesses were publicly admitting the commission of crimes. The fact of the agreements thus was relevant to putting the essential circumstances of these witnesses' testimony before the jury even if there was no expectation of cross-examination. In any event, the evidence that the cars and copiers were bribes and not promotions was so overwhelming that any error in the admission of the immunity agreements was harmless (that is, could not have swayed a rational jury), and therefore is not a ground for reversal. See Fed.R.Crim.P. 52(a).

6. Finally, defense counsel has submitted two thick volumes of appendix consisting of excerpts from the trial transcript plus commentary, and he asks us to read these volumes and infer from them that the trial "was beset with unfairness and bias of the most pervasive and thoroughgoing kind. We respectfully submit that the District Judge was the prosecution's most effective advocate."

The argument is difficult to understand and impossible to accept. Having reviewed the specific assignments of error pressed by LeFevour in his brief, we have found not one error committed by the district

judge in the prosecution's favor in the course of a seven-week trial, except possibly (an issue we need not decide since the error if any was harmless) the admission of the immunity agreements of the auto and copier witnesses. This remarkable performance—considering the hundreds of trial rulings made by the judge—is hardly consistent with pervasive unfairness to the defendant. Having failed to persuade us that the judge committed errors against his client, the defendant's counsel asks us to aggregate the non-errors committed by the judge and reverse the conviction.

The hundreds of pages of transcript submitted by counsel show that the trial judge did indeed make many evidentiary rulings against the defendant; yet none of these rulings is challenged as erroneous apart from those we have already discussed. The government has submitted an extensive list of rulings against it, and our review of the record reveals still other rulings against the government. There was, in fact, no evidence of partisanship by the judge, making the case wholly unlike *United States v. Dellinger*, 472 F.2d 340, 386–88 (7th Cir.1972), and *United States v. Beaty*, 722 F.2d 1090 (3d Cir.1983). The exchanges with defense counsel show an occasional asperity on the judge's part, but an asperity both concealed from the jury (all objections were made and ruled on at sidebar conferences outside of the jurors' hearing) and entirely understandable in view of the rude and provocative behavior of defense counsel and his client. The tactic of a lawyer in a losing cause who tries to provoke the trial judge into error is an old one, well exhibited by LeFevour's counsel, who was twice held in contempt in the course of the trial.

But the tactic failed. The trial was fair, the district judge's conduct of the trial crisp and professional, the evidence of guilt overwhelming. The conviction and sentence are

AFFIRMED.