**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**John J. MONTANI, Defendant–
Appellant.**

No. 99–1692.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 26, 1999.

Decided Feb. 11, 2000.

Paul Garcia (argued), Office of U.S. Attorney, Chicago, IL, for plaintiff–appellee.

George Pappas (argued), Neville, Pappas, & Mahoney, Chicago, IL, for defendant–appellant.

Before WOOD, Jr., KANNE and DIANE P. WOOD, Circuit Judges.

KANNE, Circuit Judge.

John J. Montani challenges his conviction and sentence for mail fraud under 18 U.S.C. § 1341. A jury convicted Montani in March 1999 of defrauding his employer, Sears, Roebuck & Co. (Sears), of the proceeds from the liquidation sale of furniture and also defrauding Sears of the benefit of his honest services, as that term is incorporated into 18 U.S.C. § 1346. Then–District Judge Ann Claire Williams calculated Montani's offense level for a crime involving more than $500,000 and sentenced Montani to forty-one months in prison. We affirm Montani's conviction and sentence.

## I. History

John J. Montani began working for Sears in the 1960s while still in college and held a variety of positions with the company over the next twenty-five years. As part of a standard company practice, Montani agreed to abide by the company's code of business ethics, which prohibited, among other things, self-dealing transactions. In 1990, he moved from Florida to the Chicago area and became the company's national manager of finance for home fashions. Later that year, he became national manager of logistics at an annual salary of $125,000 and was told to reduce the company's furniture overstock. In this position, he was responsible for selling off, at the best possible price, furniture that Sears could not or did not want to sell in its own stores or through its catalog. Typically, the furniture to be liquidated had been damaged in some way, had been returned by customers or was simply outdated.

A variety of factors made the liquidated furniture difficult to sell. Sears required that its trade name be removed from the merchandise, that it not be resold close to a Sears store and that liquidators buy loads of the furniture sight unseen and without warranty. The company tried other ways to get rid of the furniture, including markdowns at its retail stores and through outlet stores, but these failed to reduce sufficiently the inventory. In the early 1990s, Sears had a furniture surplus valued at $100 million stacked in forty-five to fifty warehouses around the country. Montani was in charge of furniture valued at about $2.7 million.

At the direction of Donald Shaffer, the company's national merchandise manager

for furniture, Montani surveyed the furniture industry, sought advice from Sears's buyers and contacted a number of liquidators. Montani concluded that the best Sears could do would be to sell the surplus at between 7 cents and 10 cents on the dollar of the original cost to Sears. Montani reported this information to Shaffer and received Shaffer's approval to sell the furniture at 10 cents. However, Montani had difficulty finding buyers even at that price. Buyers naturally wanted to "preselect" the furniture, taking only the merchandise that could be sold and leaving Sears with the junk. Sears, understandably, wanted to push its junk off on the liquidators along with the salable merchandise.

A few years before moving to Chicago, Montani met Mark Israel, and the two discussed going into business together. Israel partly owned Diebolt Manufacturing, Inc., and Fort Dearborn Screw and Bolt, Inc., and had been involved in a similar liquidation transaction with Jack Knippel, a man who would eventually become the purchaser of the Sears furniture. Sometime in late 1991, Israel and Montani met and began to talk about Montani's liquidation problem. At this point, Israel's and Montani's versions of the story diverge. Israel, who agreed to testify against Montani in exchange for a plea agreement, said that Montani suggested that Israel purchase the furniture from Sears at 10 cents on the dollar, and if Israel could find a buyer at a higher price, the two would split the proceeds. Montani testified at trial that he did not have any idea until after the first transaction had been completed that Israel would share the profits with him. Israel formed a company called D&M Sales in 1991, and in December 1991, the company entered its first deal with Sears to buy liquidated furniture at 10 percent of cost.

D&M Sales reached a deal to resell the furniture to the Brutus Company, run by Knippel, for 50 cents on the dollar. (Montani contends that Israel told him that Knippel was paying *30 cents on the dollar*, proving, once again, the adage about honor among thieves.) To pay Montani his share and avoid detection by Sears, Montani opened a bank account in the name of Retail Logistics Consulting, for whom Montani would be paid as a "consultant." This "salary" was in reality Montani's share of the 20 cent per dollar profit earned on the sale to Knippel. Montani asserted that Israel did not offer to split the profits with him until after the first transaction had been completed. When presented with the offer, however, Montani readily accepted and had Israel write a check for $14,500 to Retail Logistics Consulting, which was in fact Montani. Montani said he did not consider the payment a kickback and insists it had no effect on his decision to continue selling to D&M. Instead, he considered it a "gift" from Israel. Sears never knew that Montani was receiving payments connected to the furniture sales nor that Montani had found, directly or indirectly, a purchaser who would pay 50 cents on the dollar for the merchandise.

The last shipment to D&M, and its last shipment to Brutus, arrived in late 1992. In that time, Knippel had received between 150 and 200 tractor–trailers full of furniture and had paid Israel $821,955. Knippel resold the furniture for about $750,000. Israel had paid Sears $196,-304.41, or about 7 cents on the dollar, and given Montani more than $306,632.10. Israel apparently attempted to keep for himself the extra 20 cents on the dollar that Knippel paid him, but it is unclear from the record how much Israel received in total, although it was at least as much as Montani received. At the same time, the two also had been running a separate scheme to dispose of Sears's used mattresses through a company called CDG Co. A Sears subsidiary, Sears Logistics Services, paid liquidators to take the used mattresses, and CDG entered into an agreement with the subsidiary to take the mattresses for a $2.50 per unit fee. In

fact, CDG was run by Israel under the false name Robert Allyn and managed by Diane Montani, the defendant's wife. Sears's checks to CDG actually went to Montani's post office box. The CDG transactions were not included in the indictment in this case, but evidence of the scheme was admitted at trial as evidence of other wrongs under Rules 404(b) and 608(b) of the Federal Rules of Evidence.

In October 1992, an internal audit showed Montani's unit had been losing more money than expected and that most of the losses were related to Montani's sales. Montani told the auditor, James Terrell, that D&M Sales was a liquidator and that 10 cents was better than Sears could expect anywhere else. In March 1993, Sears officials questioned Montani again, and Montani told them that he had received more than $300,000 from Israel as a consultant on deals unrelated to the furniture liquidation. After that meeting, Montani and Israel attempted to falsify some documents to prove Montani really was doing consulting work for D&M. Montani also falsified federal tax returns for 1991, 1992 and 1993 in an effort to convince Sears that he had legitimately earned the income as a consultant through Retail Logistics. Montani met again with Sears officials about two weeks after the first meeting, and now accompanied by an attorney, he stuck to his story about consulting for D&M. Sears fired Montani at this second meeting.

In January 1998, Montani and Israel were indicted on a one-count indictment charging them with using the mails to defraud Sears in violation of 18 U.S.C. §§ 2 (aiding and abetting), 1341 (mail fraud) and 1346 (right to honest services). Israel accepted a plea agreement and testified against Montani. The jury convicted Montani on October 29, 1998, and he was sentenced by Judge Williams on March 12, 1999. Section 2B4.1 of the United States Sentencing Guidelines mandated a base offense level of eight, and directed the district judge to follow the table in § 2F1.1 to enhance the defendant's sentence depending on the amount of the "improper benefit to be conferred" by the fraud. U.S.S.G. § 2B4.1(b)(1). Judge Williams calculated that benefit as $625,651, which represents the difference between the amount Knippel paid D&M and the amount D&M paid Sears. At that amount, § 2F1.1 requires a ten-level increase. In addition, Judge Williams added four levels for abusing a position of trust and obstructing justice for a total score of twenty-two points, which translates into a forty-one to fifty-one month sentencing range. Judge Williams sentenced Montani to forty-one months in prison.

## II. ANALYSIS

Montani raises four issues on appeal. First, he challenges the district court's decision to admit at trial evidence of Israel's guilty plea. Second, he challenges the court's decision to allow evidence regarding the CDG enterprise under Rule 404(b). Third, Montani challenges the sufficiency of the evidence against him, and finally, he contends the district court committed error by enhancing his sentence ten levels under § 2F1.1.

### A. Co-defendant's Plea

Montani contends that the district court improperly allowed evidence of Israel's plea agreement to be admitted at trial. This Court reviews for abuse of discretion a trial judge's decision to admit or exclude evidence. *See United States v. Gibson*, 170 F.3d 673, 680 (7th Cir.1999); *United States v. Mealy*, 851 F.2d 890, 898 (7th Cir.1988).

The well-settled rule in this Circuit allows the government to take the sting out of a defendant's cross-examination by introducing evidence of a co-defendant's plea agreement as part of its case in chief. *See Mealy*, 851 F.2d at 898; *United States v. LeFevour*, 798 F.2d 977, 983–84 (7th Cir.1986). A party may not "bolster the credibility" of a witness on direct examination, but we have held repeatedly

that introducing evidence of a witness's guilty plea or immunity deal serves the "truth-seeking" function of the trial by presenting all relevant aspects of a witness's testimony at one time. *See LeFevour*, 798 F.2d at 983; *see also United States v. Hedman*, 630 F.2d 1184, 1198 (7th Cir.1980); *United States v. Craig*, 573 F.2d 513, 519 (7th Cir.1978).

Montani does not dispute this settled point of law. Rather, he argues that because he offered to stipulate before trial that he would not use evidence of Israel's guilty plea to impeach Israel's testimony, the reasoning of *LeFevour* does not apply. Since he agreed not to impeach Israel with the guilty plea, Montani believes the government's only purpose in introducing Israel's guilty plea was to convince the jury that the scheme to resell the furniture was not an innocent business transaction. Montani's argument is not without force. In most criminal trials, no one disputes *whether* a crime was committed; rather, the focus is on who committed it or under what circumstances. Here, the key issue was whether the transactions were innocent business deals or criminal frauds. Israel's guilty plea would understandably persuade the jury that the deals were crooked.

■ However, Montani relies too heavily on only one aspect of the reasoning in *LeFevour*, in which we articulated one reason for allowing the government to introduce a co-defendant's guilty plea. *LeFevour*, 798 F.2d at 984. In *LeFevour*, we also explained that immunity agreements were "relevant to putting the essential circumstances of these witnesses' testimony before the jury *even if there was no expectation of cross-examination.*" *Id.* (emphasis added); *see also United States v. McNeal*, 77 F.3d 938, 945 (7th Cir.1996). The point is to present all relevant evidence at once, rather than in piecemeal fashion. As in *LeFevour*, when the jury would naturally and unavoidably wonder why the witnesses were testifying about crimes in which they were participants,

impeachment is presumed, and the government is not required to leave these doubts floating in the jurors' minds. In such a case where the witness's guilt in the acts about which he has testified unavoidably would be raised in the jurors' minds, the government's introduction of the guilty plea does not "bolster" the witness's credibility at all. Instead, it merely allows the government to provide the impeaching fact on its own terms, as permitted by *LeFevour* and its progeny.

In this case, the district court held that "[a]llowing the government to elicit this testimony from Israel during his direct examination does not amount to bolstering ... Moreover the court can give limiting instructions that will cure any potential prejudice to Montani." We think this is correct. The evidence adduced at trial implicated Israel in a scheme to bribe a Sears employee to procure a favorable deal in violation of § 1341. The jury could not help but wonder why Israel was testifying for the government and whether he had been charged in the crime. His credibility was impeached by his own testimony. No case in this Circuit holds that the government must wait for the defense to impeach a witness with evidence of a guilty plea before the government may answer with its own evidence of that plea.

Montani points to a Third Circuit case for the proposition that a court may not allow evidence of a witness's guilty plea on direct examination if the defense agrees not to elicit any information regarding the pleas during cross-examination. *United States v. Thomas*, 998 F.2d 1202, 1205–07 (3d Cir.1993). We do not read *Thomas* this broadly and note that it does not address the heart of *LeFevour*'s reasoning. *Thomas* correctly held that the district court may not allow evidence of a witness's guilty plea without some proper purpose that outweighs the prejudicial effect of the testimony. *Id.* at 1205 ("[T]he reasons of the district court for admitting the evidence of [the] guilty pleas are inadequate to support the risk of jury prejudice under

the facts of this case."). The court in *Thomas* examined the reasons given by the district judge and found that on the particular facts of that case, the reasons were insufficient. *Id.* at 1203–07. The district court in *Thomas* allowed testimony about the co-defendants' guilty pleas so that the government could blunt the defense's impeachment of its witnesses and prevent the inference that the defendant had been singled out among the conspirators. Because the defense had promised not to raise either of those inferences, the circuit court found that the district court had not relied on any proper purpose for allowing the evidence.

We agree with the logic of *Thomas*, but disagree with the defendant's assertion that this Third Circuit case, rather than *LeFevour*, controls this case. The district court here expressly relied on a proper purpose in admitting the evidence: Israel's credibility was impeached by his own testimony, and the government has a right to bring out evidence explaining to the jury the reasons for and extent of Israel's bias. The Third Circuit did not address the purpose we endorsed in *LeFevour*, which is to allow the government to present all relevant aspects of its case at one time, including the circumstances surrounding the testimony of an obvious co-conspirator. As we said in *LeFevour*, 798 F.2d at 983, and the district court noted in its order allowing Israel's testimony, this does not amount to "bolstering." By virtue of Israel's testimony, the jury could not help but wonder why a criminal such as Israel was a friendly witness to the government. His integrity and character for truthfulness would be questioned, and the government had a right to explain the circumstances regardless of whether Montani intended to impeach Israel. We cannot say that this was an abuse of discretion. In fact, it was probably harmless in that it showed Israel to be less trustworthy as a witness for the government. There certainly would be some prejudice in showing that Israel was engaged in a criminal act purportedly with the defendant, but this could be cured, as it was in this case, through the usual method of instructing the jury to consider the evidence only for credibility.

## B. The CDG Scheme

Montani next challenges the district court's decision to allow evidence of the CDG scheme under Rule 404(b) of the Federal Rules of Evidence. Rule 404 prohibits the use of character evidence for the purpose of proving that a defendant acted in conformity with his character on a particular occasion. Fed.R.Evid. 404. Montani admits that under Rule 404(b), evidence of "other crimes, wrongs, or acts" may be admitted for purposes other than to prove the defendant's bad character, such as to prove the defendant's motive, intent or knowledge or a common scheme or plan. Fed.R.Evid. 404(b). However, Montani contends that the facts of the CDG and D&M plans were too dissimilar to be relevant to guilt and therefore were merely prejudicial.

■ As a preliminary matter, the parties dispute whether Montani waived or forfeited his objection to the use of the similar acts evidence by broaching the topic before the government did. We resolved this issue in *Wilson v. Williams*, 182 F.3d 562, 566 (7th Cir.1999), in which we held that a "preemptive use of evidence does not waive an established objection." In *Wilson*, the plaintiff lost a pretrial effort to exclude evidence of his conviction but then introduced the topic in his opening statement. In the same vein, Montani questioned Israel about the CDG enterprise on cross-examination in the government's case, even though the government, which had sought before trial the right to bring the evidence in, had not used it. However, the trial court's ruling on the matter was definitive, and Montani was entitled to the anticipatory use of the evidence. We held in *Wilson* that a party is not required to object at trial to a definitive pretrial ruling. *See id.* at 565–66.

Montani adequately preserved the issue for appeal, but this victory is a hollow one.

In *United States v. Shackleford*, 738 F.2d 776, 779 (7th Cir.1984) (modified on other grounds by *Huddleston v. United States*, 485 U.S. 681, 685, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988)), we recognized a four-part test for admissibility of Rule 404(b) evidence requiring, among other things, that the prior act be similar enough to the matter at issue to be relevant. In *United States v. Lloyd*, 71 F.3d 1256, 1264–65 (7th Cir.1995), we held that the test *"need not be unduly rigid"* and the prior and instant acts need only be "sufficiently alike to support an inference of criminal intent." The two acts must share common characteristics relevant to the purpose for which they are introduced. *See United States v. Long*, 86 F.3d 81, 84 (7th Cir.1996) (citing *United States v. Torres*, 977 F.2d 321, 326 (7th Cir.1992)). Thus, the term "similarity" has been loosely interpreted and loosely applied. *See, e.g., Lloyd*, 71 F.3d at 1263–66 (holding that evidence of the defendant's gang affiliations and activities were relevant to the defendant's possession of a firearm); *Torres*, 977 F.2d at 327–28 (allowing evidence of the defendant's involvement in two unrelated, violent retaliatory incidents in prosecution for retaliation against a federal witness).

The facts of CDG require much less of a comparative leap to establish relevance to the D&M scheme. In CDG, the defendant used his position of trust and influence as a Sears employee to rig a self-dealing arrangement that funneled company resources to an entity in which he had a secret interest. Montani created the alias Robert Allyn for Israel to conceal Israel's involvement and used a post office box to hide where the checks were going. Montani needed to avoid detection for violating the company's ethical code, which prohibited an employee from having "any personal financial dealings with any individual or business organization ... which is a supplier to Sears of merchandise, supplies, property, or services." Montani contends that the CDG scam—like the D&M scam—did not actually harm Sears because Sears got the best price the market would bear. However, he fundamentally misunderstands why his actions constituted an illegal bribery scheme: Sears was entitled to the best efforts of its employee without paying a premium in the form of secret profits. The district court held that the CDG deal was sufficiently similar to the charged crime and not unduly prejudicial. Based on the overwhelming similarity, we cannot call the court's ruling an abuse of discretion.

Montani also contends that the district court erred in permitting testimony regarding the CDG venture under Rule 608(b), which permits inquiry on cross-examination into specific instances of a witness's conduct only to impeach a witness's character for truthfulness. Fed. R.Evid. 608(b); *see United States v. Smith*, 80 F.3d 1188, 1192 (7th Cir.1996). Montani again contends that because Sears benefitted from the CDG deal, the deal could not be fraud and therefore could not be probative of his character for truthfulness. Considering Montani's extensive efforts to hide the involvement of his wife, Israel and himself, it is difficult to understand his argument that the CDG issue is not probative of his character for truthfulness. Moreover, we point again to the underlying rationale behind commercial bribery laws: Sears paid Montani a salary which entitled it to his best efforts without being undermined by kickbacks, side payments or bribes. The fact that he would participate in the secret CDG scheme is highly probative of his lack of character for truthfulness.

### C. Sufficiency of the Evidence

Montani next undertakes the daunting task of a wholesale attack on the sufficiency of the evidence supporting the jury's verdict. Montani contends that the evidence failed to show that he formed the specific intent to defraud Sears, and failed

to show that Sears suffered any losses from the deal with D&M. We consider the evidence in the light most favorable to the jury's verdict and will overturn "[o]nly when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Hickok*, 77 F.3d 992, 1002 (7th Cir.1996) (citations and internal quotations omitted).

■ To sustain a conviction for mail fraud under § 1341, the government must prove three elements: (1) the defendant participated in a scheme to defraud; (2) the defendant intended to defraud; and (3) the defendant used the mails in furtherance of the scheme. *See United States v. Walker*, 9 F.3d 1245, 1249 (7th Cir.1993). The evidence presented at trial clearly established that Montani intended to deprive Sears of the benefit of his honest services, in violation of § 1346. Further, despite his protestations that the transactions were legitimate business deals, we believe there is sufficient evidence to prove Montani knew he was defrauding Sears of the premium he received by selling the furniture to Knippel. Montani represented to Shaffer, his superior, that the best price he could get for the furniture under the terms specified by Sears was 10 cents on the dollar. He then arranged with his confederate, Israel, to sell the furniture, on the same terms dictated by Sears, to a buyer who would pay at least three times that amount. To avoid detection, Montani and his confederate constructed a front operation that would provide cover for him to pocket half the extra profits. Whether the payments are termed a bribe or theft matters little. The transaction was fraudulent in that it deprived Sears of both property—the 20 cents on the dollar it lost—and the honest services of its employee. Even assuming Montani had no intent to defraud Sears in the first transaction, he continued to accept payments for subsequent transactions knowing the scheme was fraudulent.

Montani argues that he actually defrauded Knippel and not Sears. This is a peculiar defense, and it is also unavailing. Montani's reasoning goes something like this: The furniture deal was a "legitimate transaction in the marketplace" as to Sears, but was fraudulent as to Knippel. Montani would have the government prosecute him for defrauding Knippel, but exonerate him for defrauding Sears. This logic rewards form over substance. Montani believes that using Israel and constructing a sham middleman (D&M) somehow insulates one fraud from the other. If Montani had sold the furniture directly to Knippel for 30 percent of cost, given a third of that to Sears and secretly pocketed the other two-thirds (or split it with a confederate), the fraud would be apparent. Using a sham middleman to create an appearance of legitimacy is a transparent ruse which did not fool the government, did not fool twelve citizens on the jury and will not carry the day on appeal.

### D. Sentencing Enhancement

Montani continues this line of reasoning in his final point, contending that the district court erred in enhancing his sentence based on a $625,651 fraud. Although Montani was convicted of mail fraud, the government, Montani, the probation officer and the district court agreed that he should be sentenced under the bribery guideline because his offense conduct more closely resembled a fraud achieved through bribery than a straight fraud. *See* United States Sentencing Guidelines Manual § 1B1.2(a) (allowing the sentencing court to apply the guideline "most applicable to the offense of conviction."). Section 2B4.1 of the Sentencing Guidelines directs the court to increase the offender's sentence by a number of levels specified in § 2F1.1 "[i]f the greater of the value of the bribe or the *improper benefit to be conferred* exceeded $2,000." U.S.S.G. § 2B4.1 (emphasis added). A fraud of more than $500,000 but less than $800,000 earns the defendant a ten-level increase in his sentence. *See* U.S.S.G. § 2F1.1.

The district court calculated the improper benefit to Israel and Montani as the difference between the price Knippel paid and the amount Sears received, or roughly $625,000. We review *de novo* a sentencing court's conclusions of law, *see United States v. McClanahan*, 136 F.3d 1146, 1149 (7th Cir.1998), and review for clear error its factual findings in applying the Guidelines. *See United States v. Gwiazdzinski*, 141 F.3d 784, 789 (7th Cir. 1998).

Montani insists the proper measure is the value of the harm to Sears, which he calculates at zero because Sears got as much as it expected from the deal and the D&M–Knippel deal was a separate legitimate transaction. Since we, and the jury, have already dealt with the legitimate business transaction argument once, we need not do so again. We note only that Sears—not Montani—was entitled to the $821,955 that a buyer was willing to pay, a fact that the D&M front operation does not change.

Montani cites to *United States v. Andersen*, 45 F.3d 217, 221 (7th Cir.1995), and *United States v. Schneider*, 930 F.2d 555 (7th Cir.1991), for the proposition that an enhancement under § 2F1.1 should not be applied if there is no proof of an actual loss to the victim. These cases, however, are inapplicable because they involve defendants sentenced for fraud under §§ 2B1.1 or 2F1.1. Montani was sentenced under § 2B4.1, the commercial bribery guideline, which merely references the *table* in § 2F1.1 and does not incorporate that section's substantive standard for sentencing. The difference is dispositive to this case: §§ 2B1.1 and 2F1.1 direct the judge to measure only the "loss," while § 2B4.1 directs the judge to measure the "greater of the value of the bribe or the improper benefit to be conferred." The guideline then is quite clear. The improper benefit to be conferred on D&M Sales was $625,-651, which earns an enhancement of ten levels.

On a related point, we note that the court must count the improper benefit accruing to D&M Sales, rather than to Israel or Montani individually. The Guidelines specifically instruct that the value is determined by the "value of the action to be taken or effected in return for the bribe." U.S.S.G. § 2B4.1 application note 2. This suggests (with no evidence of a contrary suggestion found elsewhere) that the value should be considered as a *whole*, not as individual shares to each co-conspirator. *See United States v. Cohen*, 171 F.3d 796, 803 (3d Cir.1999) (holding that improper benefit refers to the "net value accruing to the entity on whose behalf the individual paid the bribe."); *United States v. Fitzhugh*, 78 F.3d 1326, 1331 (8th Cir.1996) (reasoning that the improper benefit may be greater than the resulting loss to the victim); *United States v. Landers*, 68 F.3d 882, 886 (5th Cir.1995) (calculating the improper benefit as net value made by the entity on whose behalf bribes were paid). In this case, Sears sold the furniture to D&M Sales, which then sold it to Knippel. D&M Sales, as we stated above, was a front for the joint efforts of Montani and Israel to defraud Sears. Whether one considers D&M a real company created to defraud Sears and pass along profits to Montani and Israel, or merely a convenient disguise for the conspiracy operated by Montani and Israel, the "entity" must be D&M Sales rather than Israel alone. Therefore, the net value is $625,651.

Montani's final argument, for which he devotes two sentences and cites no authority, suggests that only his share of the loot—roughly $306,000—should be counted for sentencing purposes. That interpretation would result in a two-level decrease in his sentence. Montani's point centers on how the court should view his substantive offense conduct in relation to the Guidelines instructions on fraud and bribery. As a fraud, Montani's offense involved $625,000, earning a ten-level increase on top of a base offense level of six. Montani, however, was sentenced under

the bribery guideline, which carries a base offense level of eight, on the theory that Israel offered Montani a bribe to award the fraudulent contract to D&M Sales. The bribe came in the form of a split of the profits from the fraud, resulting in a bribe of $306,000. The question then is whether the "improper benefit conferred" should include only the after-bribe value to D&M Sales, or in other words, whether the bribe amount should be deducted from the "improper benefit."

This appears to be a question of first impression for this Court, although other circuits have had occasion to answer it already. Section 2B4.1 offers conflicting advice. First, it instructs the sentencing court to increase the offense level "if the greater of the value of the bribe *or* the improper benefit conferred exceeded $2,000." U.S.S.G. § 2B4.1(b)(1) (emphasis added). This language seems to instruct the court to look at *one but not both* of the value of the bribe or the improper benefit. However, Application Note 2 defines "improper benefit" as the "value of the action to be taken or effected in return for the bribe." U.S.S.G. § 2B4.1 application note 2. It then incorporates by reference the commentary to § 2C1.1, the official bribery guideline, which expressly instructs "[d]o not deduct the value of the bribe itself in computing the value of the benefit received or to be received." U.S.S.G. § 2C1.1 application note 2. In the background to § 2C1.1, the Sentencing Commission explained "[i]ndetermining the net value of the benefit received or to be received, the value of the bribe is not deducted from the gross value of such benefit;the harm is the same regardless of the value of the bribe paid to receive the benefit." U.S.S.G. § 2C1.1 background para. 3. If it is so clear that the court should deduct the value of the bribe, why then the "or" in § 2B4.1(b)(1)?

The answer lies in the purpose of § 2B4.1(b)(1). Section 2B4.1(b)(1) serves to trigger an enhancement to a bribery conviction based on the size of the crime, but allows for situations where small bribes may cause great harm or large bribes unexpectedly may result in small improper benefits. In this way, it prevents a defendant from arguing that a small bribe or a small improper benefit should result in a shorter sentence. Consider, for example, if the guideline mentioned only the value of the improper benefit, a defendant who had accepted a large bribe would get a short sentence if the bribery scheme unexpectedly resulted in a small profit, say because the property taken turned out to be worthless. The Guidelines take this potential into account by instructing the judge to look at both components of the bribery scheme—the bribe and the benefit—to determine the magnitude of the crime.

This does not mean that the court should deduct the bribe from the "improper benefit." To the contrary, Application Note 2 defines the improper benefit as the "value of the action to be taken ... in return for the bribe." It envisions the simple case where a person pays an official $10,000 and gets rewarded with a $100,000 contract. Following § 2C1.1, the improper benefit would be $100,000, not $90,000, because $100,000 reflects the true magnitude of the crime. In Montani's case, the bribe was not a flat fee, but a share of the profits obtained by D&M Sales. D&M received a $625,000 benefit from which it paid a $306,000 bribe. The principle remains, however, that the improper benefit is $625,000, not $319,000.

The other circuits who have looked at this issue concur. In *United States v. Landers*, 68 F.3d 882, 885 (5th Cir.1995), the Fifth Circuit expressly recognized that the value of the bribe should not be deducted from the net value of the improper benefit. In *United States v. Schweitzer*, 5 F.3d 44, 47 (3d Cir.1993), the Third Circuit also held that the amount of the bribe should not be deducted from the "net value" of the improper benefit. *See also United States v. Leon*, 2 F.Supp.2d 592 (D.N.J.1998) (holding that "the amount of

any bribe paid ... would not be deductible."). This rule comports with the purpose of the sentencing guideline to measure the true magnitude of the crime for which the defendant was convicted. Allowing the defendant to deduct the amount of the bribe would grant a reprieve to those who received larger bribes without regard to the amount of the "improper benefit." To hold the contrary would grant Montani a reduced sentence because his bribe was $312,000 rather than $50,000. That cannot be the outcome intended by the Commission.

### III. CONCLUSION

For the foregoing reasons, we find no error in Montani's trial and uphold the sentence imposed by the district court. The judgment and sentence are AFFIRMED.