In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3468

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

WINSTON SANCHEZ,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Indiana, Evansville Division.
No. EV 99-09-CR-Y/H-04--Richard L. Young, Judge.

Argued April 9, 2001--Decided May 9, 2001


  Before POSNER, EVANS, and WILLIAMS,
Circuit Judges.

  EVANS, Circuit Judge. A jury convicted
Winston Sanchez of conspiracy to possess
with intent to distribute and
distribution of methamphetamine in
violation of 21 U.S.C. sec.sec. 841(a)(1)
and 846. On appeal, he challenges the
sufficiency of evidence presented at
trial, alleges prosecutorial misconduct,
and contends he was improperly sentenced
as a career offender. In reviewing his
conviction, we recount the facts in the
light most favorable to the government.

  Indiana resident John Brown became a
regular methamphetamine user in the late
1980's and eventually began selling drugs
to support his habit. In July 1998
Brown's sister, Tina Portee, and her
boyfriend, Julius Farris, moved from
Indiana to California. After talking with
Farris, Brown realized that
methamphetamine was cheaper in the Golden
State, and so he decided to travel west
to buy low and return to Indiana to sell
high. He borrowed money to finance his
plan and made two trips to California in
January 1999.
  On his third trip to California, Brown
invited James Coomer to travel with him.
Once in California, Brown went to visit
his sister Tina at Winchell's Donut Shop,
where she worked. There, Tina introduced
Brown to her coworker, Winston Sanchez.

Eventually, Brown and Sanchez got to chatting, and Brown asked Sanchez to get him a pound of methamphetamine. Sanchez agreed, quoting a price of between $8,000 and $9,000 per pound. Sanchez welcomed Brown to call him at work and also provided Brown with his pager number. He then went back into Winchell's, telling Brown's sister that he was trying to help her brother buy drugs.

Brown later asked his sister if he could trust Sanchez. Apparently she vouched for him, because Brown contacted Sanchez shortly after checking into the Plaza Hotel. Sanchez arrived as planned, and Brown gave him $9,000 in cash. Sanchez took the cash and wandered off for several hours, returning to the hotel to inform Brown that he was unable to contact his supplier. He then went out again for several more hours, this time returning with one pound of methamphetamine. Sanchez also refunded $1,000 because he had been able to purchase the drugs at a lower price than anticipated.

Brown and Coomer returned to Indiana, sold the drugs, and planned another trip to California. On this visit, Brown brought along his girl friend, Tonya Fithian, and another friend, Jim Miskell. Brown and his paramour traveled in one car and Miskell and Coomer in another. Again, after arriving in California, Brown called Sanchez from his hotel, gave him $18,000 in cash, and this time requested double the quantity of drugs-- two pounds. Again, Sanchez procured the drugs and delivered them to Brown's hotel. Brown and his associates then headed back to Indiana to sell their wares.

Weary of road trips, Brown decided to fly to California for his next trip. He traveled with his niece. Miskell and Gregory Farris traveled by car, taking $36,000 in cash with them. Once in the Golden State, Brown, accompanied by his niece and sister, went to Winchell's to visit Sanchez. Again, Brown doubled his request, asking Sanchez for four pounds of methamphetamine. As before, Sanchez picked up $36,000 in cash from Brown at his hotel and returned hours later with the drugs. During this third visit, the two also discussed a future sale in which Sanchez agreed to deliver another seven

pounds of drugs to Brown in a week or two.

Sanchez then drove Brown and his niece to the airport, while Miskell and Farris drove back to Indiana with the drugs. As they drove through Texas, they were stopped for a seatbelt violation. Miskell consented to a search of the car, and the police found the drugs. With information obtained after the stop, Brown was arrested upon his return to Indiana.

Brown, Miskell, and Coomer pled guilty and testified on behalf of the government. Sanchez was tried to a jury before District Judge Richard L. Young and found guilty of conspiracy. Based on his criminal history record which included, among other offenses, convictions for residential burglary and possession of marijuana for sale, the recommended sentencing range was 360 months to life. Judge Young sentenced Sanchez to the low end of that range.

First, Sanchez challenges the sufficiency of the evidence presented to the jury, arguing that his repeat transactions with Brown constituted nothing more than a buyer-seller relationship. A challenge to the sufficiency of the evidence is an uphill battle. United States v. Thornton, 197 F.3d 241, 253 (7th Cir. 1999) ("Prevailing on a sufficiency of the evidence challenge is as unlikely as hearing the song of a warbler on a central Chicago street in February, with or without the aid of a bionic ear."). We will view the evidence in the light most favorable to the government, indulging all reasonable inferences that benefit the prosecution. United States v. Gardner, 238 F.3d 878, 879 (7th Cir. 2001). Because great deference is given to the jury, we will overturn a verdict "only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." United States v. Phillips, 239 F.3d 829, 842 (7th Cir. 2001) (citing United States v. Rosalez-Cortez, 19 F.3d 1210, 1215 (7th Cir. 1994)).

Here, in order to prove a conspiracy, the government had to present evidence of an agreement to achieve a criminal objective separate from the initial

crime--the sale of drugs by Sanchez to Brown. United States v. Lechuga, 994 F.2d 346, 347 (7th Cir. 1993) (en banc). However, the agreement need not be explicit and no overt act is required. Thornton, 197 F.3d at 254. Rather, we have noted that in the murky world of illicit drugs, conspiracies are, by necessity, loosely-knit associations. United States v. Smallwood, 188 F.3d 905, 912 (7th Cir. 1999). Thus, a conspiracy to distribute drugs can consist of an implicit understanding between the parties, evidenced by "transactions involving large quantities of drugs, prolonged cooperation between the parties, standardized dealings, and sales on a credit." United States v. Berry, 133 F.3d 1020, 1023 (7th Cir. 1998). While these factors are instructive, no single factor is dispositive. United States v. Pearson, 113 F.3d 758, 761 (7th Cir. 1997).

Essentially, Sanchez contends that the evidence was insufficient to support a conspiracy conviction because his association with Brown was limited and the drugs were not sold on consignment. Regarding his limited involvement, he argues that the government failed to present evidence that he helped to package, conceal, or ship the drugs or that he had conversations with Brown and his cohorts about the distribution process in Indiana. However, as we have said before, an explicit agreement is not required. A conspiracy can be established if an agreement can be inferred from the course of dealings between Brown and Sanchez. United States v. Hall, 109 F.3d 1227, 1232 (7th Cir. 1997). Moreover, the government was not required to show that Sanchez was involved in every aspect of the distribution process in order to establish his complicity. United States v. Thornton, 197 F.3d at 254 ("One need not be at the heart of a conspiracy to be part of its web.").

Here, the government presented evidence that Sanchez formed a friendship with Brown's sister, agreed to help Brown get drugs, and provided him with both a work and pager number. Then, on three separate occasions, Sanchez responded to Brown's page, went to Brown's hotel, picked up the purchase money, and returned with the drugs.

The government also presented facts from which a jury reasonably could infer mutual trust. For instance, during each sale, Brown allowed Sanchez to walk away, unaccompanied, with wads of cash, at one point as much as $36,000. Moreover, the quantity of drugs Brown requested increased exponentially over the course of only one month--starting at one pound and increasing to four, with a promise of an additional seven pounds within a few weeks. This rapid increase suggests that Brown found Sanchez to be a trustworthy supplier, and business was booming. On his part, Sanchez fostered goodwill and trust by refunding $1,000 of the purchase price during the first transaction, claiming that he had been able to purchase the drugs at a discount. Then, after the third sale, he provided the additional service of driving Brown and his niece to the airport. Based on this evidence of repeat sales, the promise of future sales, standardized dealings, and the level of trust between the parties, a reasonable jury could have found that Sanchez and Brown formed a continuing and mutually profitable relationship to distribute drugs.

Sanchez's second argument that consignment sales were required to establish a conspiracy also fails to carry the day. He contends that because he was paid up-front for each drug purchase, he had no stake in the conspiracy. First, we note that while we consider several factors to be indicative of a conspiracy, no one factor is determinative. Thus, the absence of one factor does not mean we have to throw out the jury verdict where the government has established other factors which point to the existence of a conspiracy. United v. Menting, 166 F.3d 923, 929 (7th Cir. 1999). Credit drug sales are not a required element of a conspiracy to distribute drugs; rather, they are merely one factor from which the existence of a conspiracy can be inferred. See United States v. Pearson, 113 F.3d 758, 761. Here, the jury was presented with ample evidence of a joint venture between Sanchez and Brown. Thus, the absence of credit sales does not sway us.

We now turn to Sanchez's remaining arguments alleging two forms of prosecutorial misconduct and a sentencing error. Citing Brady v. Maryland, 373 U.S.

83, 87 (1963), Sanchez contends that the government failed to disclose the "true sentences" received by testifying codefendants Miskell and Coomer, both of whom entered into plea agreements and testified for the government at Sanchez's trial. The government, in turn, agreed to recommend a downward departure of 2 levels for each when their cases were called for sentencing. The government disclosed the written plea agreements to defense counsel and followed the terms of those agreements. At sentencing, however, Judge Young departed from the government's recommendation and gave both Coomer and Miskell a more generous downward departure, resulting in a sentence for each of 24 months. Sanchez contends that the government failed to disclose the true sentence that Miskell and Coomer received. However, both were sentenced after Sanchez's trial. At the time of the trial, the government did not know what sentence Judge Young would impose, and because the government cannot suppress evidence that does not exist at the time of the trial, there is no Brady violation as claimed by Sanchez.

Next, Sanchez attacks statements made by the government during redirect examination and closing arguments. He argues that the prosecution improperly bolstered the credibility of Miskell and Coomer by suggesting that they received "very little" reduction in their sentences for their testimony at trial. After reviewing the record, we find no misconduct. Defense counsel raised the issue of sentencing and made confusing statements regarding the plea agreements, suggesting that the entire sentence reduction was tied to their agreement to testify. This was misleading. In response, the prosecutor provided clarification, distinguishing between potential sentence reductions for accept ing responsibility, playing a relatively minor role in the conspiracy (both Miskell and Coomer were drug carriers), and for cooperation at trial. The government also stressed that Judge Young, not the government, would ultimately determine the sentence of each cooperating witness. We find that the government's statements were invited by defense counsel's characterization of the sentencing process and that they were not impermissible advocacy.

Finally, Sanchez argues that he was improperly sentenced as a career offender. With a nod to Apprendi v. New Jersey, 120 S. Ct. 2348 (2000), he argues that the Supreme Court requires that prior convictions be found beyond a reasonable doubt by either the district court or the jury. As we have said before, this is not so. United States v. Sandoval, 241 F.3d 549, 550 (7th Cir. 2001). Rather, Apprendi specifically created an exception for prior convictions. Id. at 2362-63 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). Thus, Judge Young did not err in considering Sanchez's prior convictions at sentencing.

AFFIRMED.