# In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-2406

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FEMI JOHNSON,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 CR 103—**Matthew F. Kennelly**, *Judge.*

_____

ARGUED DECEMBER 2, 2005—DECIDED FEBRUARY 10, 2006

_____

Before BAUER, POSNER, and MANION, *Circuit Judges.*

BAUER, *Circuit Judge.* A jury convicted Femi Johnson of
one count of conspiring to possess with intent to distribute,
and to distribute, heroin in violation of 21 U.S.C. § 846, and
two counts of possession of heroin with intent to distribute
in violation of 21 U.S.C. § 841(a)(1). Johnson challenges his
conviction claiming prosecutorial misconduct, insufficient
evidence to support the jury verdict, failure of the district
court to instruct the jury properly, and denial of his right to
present witnesses in his defense. He also challenges his
sentence. We affirm Johnson's conviction but order a
limited remand to the district court in accordance with our

decision in *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005).

## I.  Background

In November 1999, a government informant named Henry Adebayo engaged Kenny Mohammed, whom he knew to be a drug dealer, in a series of recorded conversations to arrange heroin purchases. Mohammed told Adebayo that he had to call a friend, Johnson, to obtain heroin. Mohammed and Johnson agreed that a sale would take place when Mohammed informed Johnson that the buyer was ready.

On January 28, 2000, agents fitted Adebayo with a recording device and supplied him with buy money. While waiting with Adebayo at Leona's restaurant in Hyde Park, Mohammed received a phone call and told the caller that he would meet him shortly. When they left Leona's, Adebayo returned to his car; Mohammed entered a wine-colored Toyota Corolla, driven by a black male, with tinted windows and Texas license plates. Agents then observed Mohammed walk to Adebayo's car, take the buy money, return to and enter the Corolla, exit and walk back to Adebayo's car, and hand Adebayo an object resembling a newspaper. This comports with Adebayo's later testimony that he and Mohammed exchanged the buy money for heroin while the two men were in Adebayo's car in front of the nearby McDonald's. Mohammed, on the other hand, later testified that Adebayo gave him the money while they were still at Leona's, and that he gave Adebayo the heroin while they stood in front of the McDonald's. After Mohammed left the car, agents saw Adebayo drive off, followed him, and recovered fifty grams of heroin from inside the newspaper. Another agent followed the Corolla to the north side of the city, where it turned around and headed south.

After several more conversations with Mohammed, Adebayo succeeded in scheduling another transaction for February 16, 2000. Mohammed testified that he contacted

Johnson to tell him that his "guy" was ready and to order seventy grams of heroin. When Johnson agreed and asked where to meet, Mohammed instructed him to go to the apartment building at 7337 S. South Shore Drive. Mohammed testified that they agreed to the same unit price as was paid for the January 28 transaction: "Since the other one was $5,000, this one was $7,000, I told him already." Later, Mohammed received a phone call and traveled with Adebayo to the apartment building, where they waited for Johnson to arrive with the heroin.

Agents monitored the apartment building in anticipation of the second controlled purchase. Earlier, they had given Adebayo $7,000 in buy money and recorded the serial numbers on the bills. The same wine-colored Corolla arrived at the apartment building. An agent observed Mohammed make an exchange with the driver. Mohammed testified that he took the heroin from Johnson in the Corolla, brought it to Adebayo, exchanged it for the money, and then went upstairs with Johnson to Mohammed's apartment. According to the agents, the fire lane in which the Corolla was parked presented surveillance problems. As a result, the agents did not observe Mohammed or Johnson enter the building. Only by moving to an area just north of the fire lane could DEA Agent William Wilson observe the Corolla leave the apartment building.

After the Corolla left, agents recovered the approximately seventy grams of heroin from Adebayo, while Customs Agent John Coleman followed the Corolla to the 8600 block of South Saginaw Street. There, Coleman saw the driver leave the car and enter a house, before returning to the car. Agent Coleman again followed the Corolla, which proceeded to turn right while signaling left, make a sharp right turn, accelerate sharply, run two red lights, weave through traffic, and run yield signs at cross streets. When Coleman could no longer keep pace with the car, he radioed for assistance. Officer Robert Sapp, who was part of the

surveillance team, pulled the Corolla over after it ran a third red light. Johnson was the driver.

Officer Sapp discovered $5,950 in U.S. currency wrapped in newspaper in the glove compartment. Agents photocopied the bills, whose serial numbers matched the ones agents had recorded for $5,950 of the $7,000 given to Adebayo. Agents gave Johnson a receipt for the money. On February 24, 2000, in order to maintain the covert nature of the investigation, agents gave the money to Witness A, who claimed that she had given it to Johnson to purchase a car on her behalf. In early February 2001, Witness A was indicted and arrested for making false statements to federal agents in violation of 18 U.S.C. § 1001. While in custody, she said that Johnson had paid her $200 to tell the agents that the money belonged to her. Based on this statement, the complaint was dismissed without prejudice, as the government "expected her to be a cooperating witness."

On June 2, 2001, authorities arrested Johnson on conspiracy and possession charges. Shortly before trial, Witness A's attorney informed the government that she had reversed herself again and was prepared to testify consistent with her original statement. As a result, the government complied with a court order requiring disclosure of impeachment evidence by sending a letter to defense counsel indicating that Witness A was again a possible subject of investigation. In response to the defendant's subpoena, Witness A invoked her Fifth Amendment privilege against self-incrimination.

Johnson's trial began on November 19, 2003. In both voir dire questioning and opening statement, defense counsel indicated that Johnson's defense would be to attack Mohammed's credibility. During trial, the government called a number of witnesses, including Agent Coleman, who gave expert testimony that the supplier in a brokered drug deal will often be present in the area to ensure that he receives

payment from the sale proceeds, just as Johnson did on these two occasions. Mohammed also testified for the government, relating the circumstances of the two transactions. The court allowed the government to introduce the court's order granting Mohammed immunity and compelling his testimony. Accordingly, the prosecutor questioned him on direct examination about his understanding of the immunity agreement. On cross-examination, defense counsel questioned Mohammed about the dependence of his "safety valve " reduction[1] on pleasing the government with his testimony against Johnson. On redirect, then, the government questioned Mohammed about the facts omitted by defense counsel, such as all five of the factors considered by the court in determining safety valve eligibility.

At trial, Johnson never set forth a buyer-seller defense; rather, he argued that he was "not a drug dealer." During closing arguments, the prosecutor portrayed Mohammed as a credible witness based on the evidence corroborating his testimony. He stated that Mohammed "is here under an order" and "understands he needs to tell the truth." Defense counsel, in closing argument, argued that "Kenny Mohammed wasn't telling the truth. He had every incentive to lie." Responding in rebuttal, the prosecutor again raised Mohammed's immunity agreement to demonstrate his incentive to testify truthfully. No buyer-seller jury instruction was requested by either party and none was given. On Novem-

---

[1]  The safety valve provision of 18 U.S.C. § 3553(f) allows the district court to depart below the statutory mandatory minimum sentence for certain drug offenses if the defendant satisfies each of the five criteria set forth in the statute. *See also* U.S.S.G. § 5C1.2. The provision generally applies "where the defendant is a first time offender who was not the organizer or leader of criminal activity and has made a good faith effort to cooperate with the government." *United States v. Harrison*, 431 F.3d 1007, 1013 (7th Cir. 2005).

ber 25, 2003, the jury found Johnson guilty of the conspiracy and possession counts. On May 14, 2004, Judge Kennelly imposed an enhancement for obstruction of justice under the Sentencing Guidelines and sentenced Johnson to seventy months in prison. Johnson now challenges his conviction and sentence.

## II. Discussion

Johnson advances the following five arguments on appeal: (1) that prosecutors denied him a fair trial by improperly vouching for the truthfulness of government witness Mohammed during their case-in-chief and closing argument; (2) that the evidence presented by the government was not sufficient to prove Johnson guilty of conspiracy and possession beyond a reasonable doubt; (3) that the district court erred when it failed to instruct the jury on a buyer-seller defense; (4) that the government denied him the right to present witnesses in his defense by threatening Witness A with investigation and indictment; and (5) that the district court violated Johnson's Sixth Amendment rights by enhancing his sentence for obstruction of justice. We consider each claim in turn.

### A. Fair Trial

Johnson first contends that the government made improper remarks during examination and closing argument, thereby denying him a fair trial. Because Johnson did not object at trial to the remarks he now challenges, we review only for plain error. *United States v. Renteria*, 106 F.3d 765, 766 (7th Cir. 1997). Under the plain error standard, the defendant must establish not only that the prosecutor's remarks were improper and denied him a fair trial, but also that they prejudiced him by altering the outcome of the

proceedings. *United States v. Sandoval-Gomez*, 295 F.3d 757, 762 (7th Cir. 2002).

### 1. Testimony Concerning Mohammed's Immunity Agreement

During direct examination of Mohammed, the district court allowed the government to introduce the court's order granting Mohammed immunity and compelling his testimony. The court specifically stated that introduction of the order was warranted to show that Mohammed's testimony "can be used against him in a prosecution for perjury or false statement." Johnson now claims that the government exceeded the bounds of the order and "told the jury" that Johnson would be sent to jail if he testified falsely. The prosecutor told the jury no such thing; instead, he merely questioned Mohammed about his understanding of the agreement:

Q. So what could happen if you were to not tell the truth today?

A. I will be sent to jail.

This question was not improper—it was within the bounds of the court's order. Moreover, the government immediately sought to clarify Mohammed's comment about being "sent to jail":

Q. Could you at least be prosecuted is what your understanding is?

A. Right.

Q. Based on what you say here today?

A. What did you say?

Q. You could be prosecuted based on what you say here today if you were to not tell the truth; is that your understanding?

A. Right, right, right.

This exchange does not, as Johnson claims, constitute improper bolstering of a government witness. On direct examination, the government may elicit testimony regarding the witness's guilty plea or immunity deal because doing so allows the jury to hear "all relevant aspects of a witness's testimony at one time." *United States v. Montani*, 204 F.3d 761, 766 (7th Cir. 2000). The government may generally introduce this evidence regardless of whether the witness's credibility has already been attacked. *Id.* Here, however, the government introduced this evidence on direct examination because defense counsel had already signaled, in voir dire questioning and in opening statement, that Johnson's defense would be to attack Mohammed's credibility.

The prosecutor in this case did not, as Johnson claims, suggest that the government's or the court's authority rested behind the witness's testimony. Johnson cites to several cases where other Courts of Appeals have found that the government improperly vouched for the witness, but each is readily distinguishable from the present case. This is not a case where the prosecutor stated outright in closing argument that the witness could not say "whatever he wanted to say" because he would be prosecuted for perjury, and that "the court wouldn't allow" the government to do anything wrong in the trial. *See United States v. Smith*, 962 F.2d 923, 934 (9th Cir. 1992). Nor is it the case where a prosecutor, again in closing argument, stated that the witnesses would be in jeopardy if the government or the court did not believe that they were telling the truth. *See United States v. Carroll*, 26 F.3d 1380, 1389 (6th Cir. 1994). Instead, here the government properly questioned Mohammed about his understanding of the agreement he signed with the government. As this Court has stated, "it is not improper for the prosecutor to remind the jury of the deterrent effect the threat of a perjury conviction has upon

the conduct of government witnesses who to obtain a grant of immunity might otherwise be inclined to lie." *United States v. Kramer*, 711 F.2d 789, 795 (7th Cir. 1983). Because this line of inquiry was proper, there was no plain error. *See United States v. Mealy*, 851 F.2d 890, 900 (7th Cir. 1988).

### 2. Testimony Concerning Mohammed's Safety Valve Reduction

Johnson also claims that the government improperly suggested that the court had already found Mohammed's testimony truthful as a matter of law based on proceedings outside the jury's presence. In introducing evidence of an agreement, prosecutors may not imply that they possess information not heard by the jury on the issue of the immunized witness's testimony. *Mealy*, 851 F.2d at 900. As stated above, defense counsel alluded to Mohammed's lack of credibility during both voir dire questioning and opening statement. In his opening, defense counsel stated that Mohammed received a "benefit that was indirect . . . as a result of his plea." In cross-examining Mohammed, defense counsel further intimated that the safety valve reduction Mohammed received at sentencing depended on his pleasing the government. On redirect, then, the government sought to elicit those facts that defense counsel failed to mention on cross-examination, including the four other safety valve criteria and the court's role in ultimately determining Mohammed's safety valve eligibility under federal law. *See* U.S.S.G. § 5C1.2. The government at no time argued that the jury should believe the witness because the court found him truthful. Government questioning regarding the witness's understanding of his agreement with the government is proper. *See Mealy*, 851 F.2d at 900. Where defense counsel raises the issue of sentencing and makes statements regarding the witness's agreement, the government may provide appropriate

clarification of any mischaracterization. *United States v. Sanchez*, 251 F.3d 598, 603 (7th Cir. 2001). Here, because the prosecutor merely placed the circumstances of Moham-med's safety valve sentencing into proper context, the government's conduct was proper.

### 3. Closing Remarks Regarding Mohammed's Truthfulness

Johnson additionally argues that the prosecutor, in closing argument, improperly suggested that the govern-ment's and the court's actions ensured Mohammed's truthfulness. He first objects to the prosecutor's recital in closing of the circumstances of Mohammed's appearing to testify. The prosecutor described Mohammed's initial reluctance to testify and Judge Kennelly's ensuing order of immunity, which he said "takes away Kenny Mohammed's ability to assert the Fifth and forces him to come here and tell you the truth. And that is exactly what he did." The prosecutor immediately thereafter detailed the substance of Mohammed's testimony and compared it to other evidence that "corroborates what Kenny Mohammed told you from the stand." Also, when relating Mohammed's testimony, the prosecutor repeatedly intoned, "he told you the truth."

These remarks about the witness's truthfulness, however, are acceptable when placed in context with corroborating evidence. For instance, in *United States v. Morgan*, this Court found that the prosecutor did not inject his personal opinion into the trial by characterizing the witness as "an honest person." 113 F.3d 85, 89 (7th Cir. 1997). Because the comment was immediately preceded by the prosecutor's argument that corroborating evidence showed the witness to be truthful, the prosecutor's comment was "a permissible inference from the evidence, not improper vouching." *Id.* at 90. The same is true here. Where the government charac-

terizes a witness's credibility "based on the evidence," the argument is proper because it is based on the record instead of "the prosecutor's own personal belief." *United States v. Clarke*, 227 F.3d 874, 884 (7th Cir. 2000). Because the prosecutor premised Mohammed's truthfulness on "all of the evidence in this case" and stated that the jury must "consider all of it together," his remarks constituted a permissible credibility argument based on the evidence, not improper vouching based on his personal belief.

Second, Johnson challenges the government's later remarks in closing to the effect that Mohammed "is here under an order" and "understands he needs to tell the truth" if he wanted to avoid a possible return to jail. Again, though, where a prosecutor comments during closing argument on a witness's veracity but then follows with a comparison to other evidence presented at trial, the comment reflects "evidence presented at trial and not the prosecutor's personal opinion." *United States v. Goodapple*, 958 F.2d 1402, 1410 (7th Cir. 1992). As described above, the prosecutor in this case acted properly—he surveyed the evidence corroborating Mohammed's testimony and from that evidence assessed his credibility. As in the following example, the prosecutor's closing argument portrayed Mohammed as credible based on the evidence taken as a whole:

> He told you the truth, and he told you that he got heroin from the defendant. He told you the truth, that he sold that heroin to Henry Adebayo, and he told you the truth, that he took the money from that sale and gave it to the defendant, the supplier of that heroin. That was the brokered transaction. You know that Kenny Mohammed told you the truth from all of the evidence in this case. The evidence in this case corroborates what Kenny Mohammed told you from that stand.

The prosecutor then proceeded to summarize that corroborating evidence, discussing the recordings of Mohammed receiving and making calls before the transactions, the testimony of agents who witnessed the wine-colored Corolla and Mohammed's movements at both transactions, the expert testimony of Agent Coleman regarding the typical structure of these drug transactions, and the evasive moves made by Johnson in the wine-colored Corolla. Thus, the prosecutor properly argued that the evidence compelled the conclusion that Mohammed complied with his immunity agreement by testifying truthfully. *See Clarke*, 227 F.3d at 885 (holding that the prosecutor's statement about a witness's truthfulness was proper "because the evidence showed that [the witness] complied with the plea agreement, not that [he] told the truth simply because he entered into the plea agreement.").

Finally, Johnson challenges the prosecutor's rebuttal remarks again referencing the immunity order. One of defense counsel's arguments in closing was that "Kenny Mohammed wasn't telling the truth. He had every incentive to lie." In rebuttal, the prosecutor responded by arguing that Mohammed understood "that he could be prosecuted for perjury based on what he told you in Court today if it turned out that what he said was not true," and further that "Kenny Mohammed has no incentive in this case to not tell you the truth." Yet again, however, the prosecutor placed these remarks in context by telling the jury that it "will be able to judge him . . . not only by what he said, but also by the corroborating evidence," which the prosecutor then reviewed. Moreover, he specifically anticipated the court's instruction to the jury to consider the evidence "with caution and care," stating that "[t]he government asks that you do that." The government's reference in closing argument to a witness's truthfulness is proper so long as the remarks are "tied to the evidence presented at trial or reasonable inferences from that evidence," rather than

personal opinion. *United States v. Robbins*, 197 F.3d 829, 843 (7th Cir. 1999). Our review of the record reveals that the theory of the defense was to attack Mohammed's credibility. The defense argued in closing that Mohammed "wasn't telling the truth" and "had every incentive to lie," thus inviting a response from the prosecutor. *See id.* As a result, the prosecutor's comments in rebuttal were meant to "right the scale" and were not improper. *See id.*

## B. Sufficiency of the Evidence

Johnson next asserts that the evidence presented at trial was insufficient to establish beyond a reasonable doubt that he was guilty of the conspiracy and possession counts. We review a jury's sufficiency of the evidence determination "in the light most favorable to the government and uphold . . . a jury's decision if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Burke*, 425 F.3d 400, 415 (7th Cir. 2005) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We will indulge all reasonable inferences that benefit the government. *United States v. Sanchez*, 251 F.3d 598, 601 (7th Cir. 2001). Because great deference is given to the jury, a verdict will be overturned only if we find that "the record contains no evidence, no matter how the evidence is weighed, from which the jury could have found guilt beyond a reasonable doubt." *Burke*, 425 F.3d at 415.

### 1. Conspiracy

Under 21 U.S.C. § 846, a conspiracy exists where: "(1) two or more people agreed to commit an unlawful act[;] and (2) the defendant knowingly and intentionally joined in the agreement." *United States v. Gardner*, 238 F.3d 878, 879 (7th Cir. 2001). In order to support a conspiracy conviction, the government must establish beyond a reasonable doubt that there was a "combination or confederation between two

or more persons formed for the purpose of committing, by their joint efforts, a criminal act." *United States v. Sullivan*, 903 F.2d 1093, 1098 (7th Cir. 1990). The government must establish that the defendant's relationship with the other conspirators was "more than a mere association." *Id.* at 1098-99. An explicit agreement, however, is not required; a jury can infer an agreement from the parties' course of dealing. *Sanchez*, 251 F.3d at 602.

Johnson argues that the evidence of conspiracy was insufficient because it proved only an ordinary buyer-seller relationship between him and Mohammed, not a joint conspiracy to sell heroin to Adebayo. Evidence that the defendant was in a mere buyer-seller relationship with the alleged coconspirator is insufficient to establish a conspiracy. *See United States v. Rock*, 370 F.3d 712, 714 (7th Cir. 2004). That remains true "even when the buyer intends to resell the purchased narcotics." *United States v. Mims*, 92 F.3d 461, 465 (7th Cir. 1996). There is sufficient evidence to establish a conspiracy, however, where the jury finds credible a government witness who shows that the alleged coconspirators were "on the same side of the transaction." *United States v. Smith*, 393 F.3d 717, 720 (7th Cir. 2004).

We will not upset the jury's credibility determination unless "exceptional circumstances" exist; that is, it was "physically impossible for the witness to observe that which he claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all." *Id.* at 719. Here, the events described by Mohammed were neither physically impossible nor contrary to the laws of nature. His testimony contained inconsistencies, to be sure— Mohammed recalled the January 28 exchange occurring at a different spot than the one remembered by the agents, and the agents did not observe Mohammed enter the 7337 apartment building on February 16, as he remembered doing. After defense counsel emphasized these contradictions in closing argument and the court instructed the jury

to consider them in assessing Mohammed's testimony, though, the jury still found Mohammed credible. As we have said before, "it is not for us to second guess" the jury's credibility determination in a sufficiency challenge. *United States v. Smith*, 34 F.3d 514, 521 (7th Cir. 1994).

The evidence presented by the government was sufficient to establish that the parties acted in concert, with the object of distributing heroin to the third-party buyer in two separate transactions. If Mohammed's testimony is to be believed, Mohammed contacted Johnson before the first transaction to obtain the heroin for resale to the customer, Adebayo. Johnson did not make Mohammed pay up front but rather waited for Mohammed "to procure the money" from the customer. *See United States v. Smith*, 393 F.3d 717, 720 (7th Cir. 2004). After the transaction, Mohammed paid Johnson for the heroin, along with $250 as a brokering commission, from the money he received from Adebayo.

Before the February transaction, Mohammed again told Johnson that his "guy," the buyer, was ready. Afterwards, he again paid Johnson from the sale proceeds, both for the heroin and for the commission. The price, $100 per gram of heroin, was the same for both transactions. Furthermore, Agent Coleman's expert testimony about the incentive suppliers have to position themselves near brokered drug deals corresponds with Johnson's behavior in these two instances. Taken together, this evidence of repeat sales, a standardized course of dealing, and trust between the parties was sufficient to establish that Mohammed and Johnson "formed a continuing and mutually profitable relationship to distribute drugs." *Sanchez*, 251 F.3d at 602. Because a reasonable jury could conclude that the two were on the same side of the transaction, the evidence was sufficient to establish a conspiracy. *See United States v. Smith*, 393 F.3d 717, 720 (7th Cir. 2004).

### 2. Possession

Johnson similarly argues that the evidence presented by the government was insufficient to establish that Johnson possessed heroin. The government's case against Johnson depended heavily, though not exclusively, on Mohammed's testimony, described above. The principles described above in reference to Mohammed's credibility apply equally to Johnson's conviction on the possession counts. *See United States v. Smith*, 34 F.3d 514, 521 (7th Cir. 1994). A reasonable jury, crediting this testimony, could infer that Johnson possessed and transferred heroin to Mohammed in exchange for money. Additionally, the government presented substantial evidence corroborating Johnson's possession. Agents observed a wine-colored Toyota Corolla with tinted windows and Texas license plates at both the January 28 transaction and the February 16 transaction. Immediately after the first transaction, agents observed the car engage in an evasive counter-surveillance excursion from the south side to the north side of Chicago. In the same automobile, Johnson engaged in an erratic and high-speed flight from agents shortly after the second transaction. Agents recovered from Johnson the cash, identified unmistakably by serial number, provided to Adebayo earlier that day to purchase heroin from Mohammed. Together, Mohammed's testimony and the corroborating evidence provided sufficient evidence to support Johnson's possession conviction. *See United States v. Smith*, 393 F.3d 717, 719 (7th Cir. 2004).

### C. Buyer-Seller Defense Instruction

Johnson also claims that the district court erred by failing to instruct the jury *sua sponte* that repeat drug sales alone do not constitute a conspiracy. Because Johnson did not tender a buyer-seller instruction or object to its omission, we review for plain error. *United States v. Askew*, 403 F.3d

496, 502-03 (7th Cir. 2005). To reverse a conviction under the plain error standard, we must find that: (1) an error occurred; (2) it was "plain," meaning obvious or clear; (3) it affected the defendant's substantial rights; and (4) it seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *Id.* (quoting *United States v. Gibson*, 356 F.3d 761, 765-66 (7th Cir. 2004)). District courts should instruct juries that repeat transactions by themselves do not constitute a conspiracy only if "the instruction has some foundation in the evidence." *United States v. Douglas*, 818 F.2d 1317, 1320 (7th Cir. 1987).

In assessing the propriety of giving the instruction, we consider whether the defendant put forth a buyer-seller theory at trial. *Askew*, 403 F.3d at 503. Finding no error in *Askew*, this Court noted that the defendant's trial strategy, denying any involvement with drugs instead of asserting a buyer-seller defense, "cuts in favor of finding no error in the district judge's decision not to give the instruction." *Id.* at 504. Here, as in *Askew*, it is undisputed that Johnson did not advance a buyer-seller theory of defense. He argued instead that he was "not a drug dealer" and so could not have supplied Mohammed with heroin for the two transactions. The strength of the evidence indicating a conspiracy, combined with Johnson's decision at trial not to pursue a buyer-seller theory of defense, leads to our conclusion that the district court did not commit plain error by declining to give the instruction *sua sponte*. *See Askew*, 403 F.3d at 504-05.

### D.  Intimidation of Defense Witness

Johnson further alleges that the government denied him constitutional due process by threatening investigation and indictment of a defense witness, Witness A, to prevent her from testifying. We review allegations of prosecutorial threatening of defense witnesses for abuse of discretion,

which arises where the prosecutor "intends to use his authority to distort the judicial fact-finding process." *United States v. Hooks*, 848 F.2d 785, 799 (7th Cir. 1988). A fundamental element of due process is the right of the accused to present witnesses in his own defense. *Id.* (citing *Washington v. Texas*, 388 U.S. 14 (1967)). Defense witnesses must be free to testify without fear of governmental retaliation. *United States v. Burke*, 425 F.3d 400, 411 (7th Cir. 2005). The defendant's right to present witnesses, however, is tempered by the witness's Fifth Amendment privilege not to provide incriminating testimony. *United States v. George*, 363 F.3d 666, 671 (7th Cir. 2004). A prosecutor may therefore caution a defense witness about the risks of testifying, but "[w]here . . . the substance of what the prosecutor communicates to the witness is 'a threat over and above what the record indicate[s] was timely, necessary, and appropriate,' the inference that the prosecutor sought to coerce a witness into silence is strong." *United States v. Jackson*, 935 F.2d 832, 847 (7th Cir. 1991) (quoting *United States v. Simmons*, 670 F.2d 365, 369 (D.C. Cir. 1982)).

At trial Johnson wanted Witness A to testify that she had given Johnson $5,950, the amount seized by Officer Sapp from Johnson's car, so that Johnson could purchase a car on her behalf. When she initially told agents that account in February 2000, they gave her the money in order to keep the investigation "covert." Witness A was arrested and indicted approximately a year later. Although Johnson now describes this complaint as "flimsy," the government is correct in presuming that Witness A would have a difficult time explaining how money that supposedly belonged to her bore the serial numbers of bills that agents had given to Adebayo to purchase heroin. In fact, she admitted while in custody that Johnson had paid her $200 to fabricate the story. As a result, the criminal complaint was dismissed without prejudice because the government "expected her to

be a cooperating witness." In fall 2003, shortly before the trial was scheduled to begin, because she again reverted to her original account of events, the government understandably designated her a subject of investigation once again. In response to the defendant's subpoena, Witness A invoked her Fifth Amendment privilege against self-incrimination.

The government announced its changed position in the following letter to defense counsel:

> Witness A is currently the possible subject or target of an investigation concerning false statements and/or obstruction of justice concerning her statements on February 24, 2000, and she may be charged with a crime. The U.S. Attorney's Office currently has not provided Witness A with any consideration or promises of consideration.

Significantly, this announcement was made to Johnson and his counsel, not to Witness A. The fact that the disputed language appeared in a court-ordered letter to defense counsel, a rather inefficient medium for conveying threats to a witness, suggests that it probably was not intended to deter Witness A from testifying. After all, this line of cases focuses on "what the prosecutor communicates *to the witness*." *Jackson*, 935 F.2d at 847.

The government's messages to a witness, conveyed through defense counsel, have in the past been held to be improper threats. *See, e.g.*, *United States v. Morrison*, 535 F.2d 223, 225-26 (3d Cir. 1976). In *Morrison*, however, the prosecutor's conduct was far more flagrant; he sent messages to the witness through defense counsel on three occasions communicating "that she was liable to be prosecuted on drug charges; that if she testified, that testimony would be used as evidence against her and, further, that as she was now eighteen it would be possible to bring federal perjury charges against her." *Id.* at 225. The prosecutor

further subpoenaed the witness and had her brought into his office for a meeting with three undercover agents to impress on her again the dangers of testifying. *Id.*

The letter sent by the government in this case does not approximate the actions taken by the prosecutor in *Morrison*. Here, the letter conveyed accurate information about the risks Witness A faced by testifying, and contained a single warning instead of several. Where the prosecution simply presents the facts to the witness, informing him that he is the target of an investigation and providing him with a warning, no constitutional violation occurs. *Jackson*, 935 F.2d at 847. Moreover, no evidence indicated that the letter sent to defense counsel was intended as a message to Witness A; to the contrary, the government sent the letter to comply with a court order requiring disclosure of impeachment evidence. Because the letter was not directed to Witness A and none of its language can fairly be construed as overreaching or improper intimidation, there is no basis in the record from which to conclude that the government improperly threatened her, procured her unavailability, or caused her to invoke the privilege. On the contrary, the government had a reasonable basis to believe that Witness A was a possible subject of prosecution. The court accordingly considered her assertion of the Fifth Amendment privilege in light of the "plainly incriminating nature of the proposed testimony." *George*, 363 F.3d at 671. Thus, Johnson's right to present a defense was not violated by Witness A's invocation of her Fifth Amendment privilege.

**E. Limited Remand**

Finally, Johnson challenges his sentence, asserting that the court's mandatory application of the Guidelines made the sentence improper. In *United States v. Booker*, the Supreme Court held that "the Sixth Amendment as construed in *Blakely* does apply to the Sentencing Guidelines."

125 S.Ct. 738, 746 (2005). Accordingly, "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Id.* at 756. Because the court based Johnson's enhancement on his statements at the suppression hearing, none of the relevant facts were found by a jury. Moreover, the parties do not dispute that at the time of defendant's May 2004 sentencing, the district court regarded the Sentencing Guidelines as mandatory.

Because the Supreme Court rendered the Guidelines advisory, "the mere mandatory application of the Guidelines—the district court's belief that it was required to impose a Guidelines sentence—constitutes error." *United States v. White*, 406 F.3d 827, 835 (7th Cir. 2005) (citing *Booker*, 125 S.Ct. at 769). It is impossible to say whether the court would have imposed the same sentence knowing that the Guidelines were advisory. Therefore, we order a limited *Paladino* remand to determine whether the district court, treating the Guidelines as advisory, would reimpose the same sentence. *See United States v. Paladino*, 401 F.3d 471, 484 (7th Cir. 2005).

## III.  Conclusion

For the foregoing reasons, we AFFIRM Johnson's conviction. While retaining jurisdiction, we remand to the district court for proceedings consistent with *Paladino*, 401 F.3d at 483-84.

A true Copy:

    Teste:


                _____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*