NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued May 4, 2009
Decided May 28, 2009

*Before*

MICHAEL S. KANNE, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*

ROBERT M. DOW, JR., *District Judge* [*]

No. 08-2817

| | |
|---|---|
| UNITED STATES OF AMERICA, | Appeal from the United States District |
| *Plaintiff-Appellee*, | Court for the Central District of Illinois. |
| *v.* | No. 07 CR 10044 |
| COREY L. JOHNSON, | Joe Billy McDade, |
| *Defendant-Appellant*. | *Judge*. |

**ORDER**

Following a three-day jury trial, Corey Johnson was convicted of conspiracy to distribute more than 50 grams of crack cocaine and more than five kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(A).  Because he had` two prior felony drug convictions, Johnson was sentenced to a term of life in prison.  He appeals his conviction, contending that the evidence was insufficient to support a conspiracy conviction and that

---

[*]  The Honorable Robert M. Dow, Jr., United States District Court Judge for the Northern District of Illinois, sitting by designation.

the district judge erred when he refused to give a buyer-seller jury instruction. With those issues in mind, we set out the relevant facts, as we must for the issue of the sufficiency of the evidence, in the light most favorable to the government. United States v. Farris, 532 F.3d 615 (7th Cir. 2008).

Although they are not related, Corey Johnson, who lived in Peoria, and a man named Ty Johnson, who lived 40 miles away in Bloomington, have known each other since the mid-90s. (We'll call Ty Johnson "Ty" and defendant Corey Johnson "Johnson.") In May of 2002, the two men made the 150 mile or so drive to an auto repair garage in Chicago to get cocaine. Ty gave Johnson $10,000. Johnson went into a back room of the garage with a man called "Big Homey" and emerged with a half-kilogram of powder cocaine. Ty and Johnson drove back to Bloomington, where Johnson gave Ty the cocaine and returned to Peoria. Ty distributed the cocaine in Bloomington.

The procedure was repeated a little later but this time they obtained five kilograms of powder cocaine, with Johnson contributing $19,000 for one of the kilos. Again they drove back to Bloomington where Johnson gave Ty his kilo. Johnson took the remaining four kilos with him to Peoria, where he distributed it, selling some as powder and cooking some into crack. Another time, following the same procedure, Ty took $10,000 with him and together the two obtained about 3 ½ kilograms of cocaine. Other times, Ty called Johnson and asked if Johnson would arrange a drug purchase for him. Ty would order either a half-kilogram or a kilogram and on these occasions, Ty himself would pick up the drugs from Big Homey. Once or twice in 2002, Johnson gave Ty money and Ty picked up drugs for Johnson in Chicago and dropped them off in Peoria. A dozen or so other times, the two pooled their money and Ty picked up drugs from the auto repair shop for both of them.

In the fall of 2002, Ty went to Hawaii for a couple months but he arranged that while he was gone, Rico Trice, a Bloomington drug dealer whom Ty regularly supplied, could obtain cocaine directly from Johnson. Trice called Johnson and met him at a McDonald's in Peoria. From there, they went to Johnson's house, where Trice bought an ounce of powder cocaine for $900. In turn, Trice sold the cocaine in Bloomington. The procedure was repeated the next day, except that this time Johnson sold Trice two ounces of powder cocaine for $1800. A few days later, using much the same procedure, Johnson fronted Trice 4 ½ ounces of powder cocaine, for which Trice paid half the purchase price. Trice obtained cocaine and crack cocaine several more times with the last sale in late December 2002.

At about that time, Ty returned from Hawaii and resumed his relationship with Johnson. Ty went to Chicago to obtain drugs several times. One time, he could not locate the supplier at the auto repair shop. Ty called Johnson who "hooked it up" and Ty got the

drugs he wanted.  On Ty's trips to Chicago he obtained a half-kilogram to a kilogram of cocaine, sometimes just for himself, other times for Johnson as well.

Johnson also sold drugs to various Peoria drug distributors, including two cousins, Tyson "Toxie" Moore and Willie Friend.  At first Johnson sold to Moore, who in turn gave some of the drugs to Friend.  When Moore moved away from Peoria, Johnson sold drugs directly to Friend.  Other drug dealers to whom Johnson sold were Daryl Lee, a coworker at an auto parts plant where Johnson worked, and Robert Griffin, another Peoria drug dealer, whose career was briefly interrupted by a jail term.  Johnson also sold directly to crack users.

Johnson's final drug deal (that we know of) occurred on October 13, 2006, when he sold Griffin 4 ½ ounces of crack.  When the police arrested Griffin, he had 51 grams in his possession.  While the police were searching Griffin's house, his cell phone rang; the call was from Johnson's phone, and later, the officers determined that, in fact, Johnson made the call.  It was not unusual for a call to Griffin's phone to come in from Johnson's phone; during the preceding 6 weeks, there were calls from Johnson's phone to Griffin's 104 times and the reverse was true 16 times.  On this occasion, when Peoria Police Officer Daniel Duncan, posing as Griffin, answered the phone, Johnson asked whether he "was straight"-- street talk for asking whether a person needs any drugs.  When Duncan said he did, Johnson asked whether he wanted the "normal zone."  Knowing that any word beginning with the letter "z" was a reference to ounces, Johnson said he would come by in 15 minutes.

About 30 minutes later, Johnson and another man arrived outside the house.  Johnson called Griffin's cell phone.  When he got no answer, he drove away but returned a few minutes later, called again, but drove away when Officer Duncan answered.  By this time, Office Timothy Moore had arrived in a police cruiser.  As Griffin drove away, Officer Moore signaled for him to pull over.  At first, Johnson stopped his car and showed his driver's license.  But as other officers ran toward the car, Johnson sped off and led the officers on a high-speed chase. Eventually, Johnson and his passenger abandoned the car and fled on foot.  Johnson hid under a parked van but was spotted and arrested.  There was a small amount of marijuana in his back pocket.  The officers found neither the passenger nor cocaine that day.

Police surveillance also revealed that Johnson had two residences.  In one, he lived with his wife and in the other with his girlfriend.  When the trash at the homes was searched, officers found more than 40 plastic bags with the corners torn off, several larger plastic bags containing cocaine residue, rubber gloves, undamaged Pyrex measuring cups with rings of white powdery residue (suggesting to the police that they had been used to

cook crack).  They also found material that was discarded to make blunts–cigars from which the tobacco is removed so that they can be filled with marijuana.  The officers also searched the houses.  In one they found four small ends of blunts and a glass pipe for smoking marijuana, but no crack cocaine.  At the other, they found some plastic bags with cocaine residue, a digital scale, 45 grams of marijuana, $1,419 in currency beneath a sofa cushion and $5,650 under a mattress in a bedroom.

Both women testified for the defense at trial.  Kristin Johnson testified that her husband habitually used marijuana, but she said she never saw him use cocaine, mix cocaine, bring cocaine into the house, or sell cocaine from the house.  Johnson's girlfriend, Shuntisha Carpenter, testified that the cash the police found was hers, mostly from a tax refund check and the rest from her paycheck.  She said she kept cash because she did not have a checking account.  Carpenter testified that she saw Johnson use marijuana, cocaine, and crack but she never saw him selling drugs.  She said Johnson used the scale found at her house to be sure the amount of cocaine he obtained was what he paid for.  Carpenter also said Johnson cooked crack at her house and mixed it with marijuana to make blunts, which he smoked himself.

At trial, after the government rested its case, Johnson moved for a directed verdict.  He did not, however, renew the motion at the close of all the evidence nor did he move for a judgment of acquittal after the jury found him guilty as charged.

As for the jury instructions, the parties agreed on most of them, including the conspiracy instruction.  However, Johnson proposed that this court's pattern jury instruction on a buyer-seller relationship should be given.  The government objected, saying that Johnson had denied that he sold drugs, and when a defendant enters a general denial that he is trafficking at all, the instruction should not be given.  The district judge rejected the proposed instruction, saying he did not "think there is evidence in the record to support a buyer/seller relationship . . . ."  Johnson did not object to that ruling.

Johnson contends that the evidence presented at trial was insufficient to prove he was part of a conspiracy.  We ordinarily "must review the record in the light most favorable to the government and uphold the trier of fact's finding of conspiracy unless no rational trier of fact could have found a conspiracy based on the evidence."  United States v. Pedigo, 12 F.3d 618, 625 (7th Cir. 1993).  It is a rigorous standard.  But in this case, Johnson must move up a notch to an even more rigorous standard.  Because he did not renew the motion for a direct verdict at the close of all the evidence and did not file a motion for a judgment of acquittal, he must show that his conviction is a manifest miscarriage of justice.  United States v. Brandt, 546 F.3d 912 (7th Cir. 2008).  Under this exacting standard, reversal is warranted "only if the record is devoid of evidence pointing to guilt, or if the evidence on a

key element was so tenuous that a conviction would be shocking." Brandt, at 916 (quoting United States v. Squibb, 534 F. 3d 668, 671 (7th Cir. 2008) (quotations omitted)).  Here, under either standard, the evidence is sufficient to sustain the verdict.

In order to support a conspiracy conviction, the evidence must allow a rational jury to conclude that (1) two or more people agreed to commit an unlawful act and (2)  the defendant knowingly and intentionally joined in the agreement.  United States v. Rollins, 544 F.3d 820 (7th Cir. 2008).  A sale of drugs, on its own, is not a conspiracy because the sale itself is a substantive crime.  United States v. Avila, 557 F.3d 809 (7th Cir. 2009).  There must be an agreement that shows an understanding regarding the distribution of drugs.  And in every case, a defendant's activities must be viewed in context in order to evaluate whether a conspiracy existed.  United States v. Colon, 549 F.3d 565 (7th Cir. 2008).

Here, the relationship between Ty and Johnson meets the definition of a conspiracy. They participated in joint activity which involved large quantities of drugs, prolonged cooperation, standardized dealings, and sales on credit.  We have also said that when a seller assists his customers in ways which help create a distribution system, a conspiracy exists.  United States v. Sax, 39 F.3d 1380 (7th Cir. 1994).  Ty testified that numerous times, Johnson arranged for him to obtain cocaine from Big Homey in quantities which were obviously intended for resale.  The two traveled together to Chicago to pick up the drugs. At first, Ty gave his money to Johnson to make the deal.  These two men and later Ty's substitute dealer Trice were on the same side of the transactions.  See United States v. Johnson, 437 F.3d 665 (7th Cir. 2006).  It is impossible to conclude that Ty and Johnson drove together to Chicago from Bloomington but did not agree to obtain drugs for sale to others.  Furthermore, Johnson would not have taken Ty with him to Big Homey's garage unless he trusted him.  See United States v. Gilmer, 534 F.3d 696 (7th Cir. 2008).  Johnson's trust in Ty is also revealed by his having Ty deliver cocaine to him from Big Homey.

Other factors, such as Johnson's "hooking up" Ty  for a sale when Ty could not locate Big Homey, also show the degree of cooperation between the two.  They pooled their money to buy drugs from Big Homey.  In addition to his dealings with Ty, on Ty's word, Johnson conspired with Trice.  He allowed Trice to "substitute" for Ty when Ty was off to Hawaii, and he fronted drugs to Trice.  In short, there is no manifest miscarriage of justice here nor, under the ordinary standard,  is this a case where the evidence fails to support the verdict.

Johnson also contends that the court erred in refusing to give his proffered buyer-seller jury instruction.  We note first that there was no objection at trial to the refusal to give the instruction.  Rule 30 of the Federal Rules of Criminal Procedure requires that a

defendant "who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." Johnson's objection does not satisfy the Rule 30 requirements. He proposed the instruction, but did not clearly state his reasons for objecting to the court's refusal to give it. In the context of this trial, where Johnson's denial that he was a drug dealer at all would make a judge skeptical of the appropriateness of a buyer-seller instruction, it was important for Johnson to set out the reasons that the instruction should be given.

So our review on this issue is only for plain error. We look to see whether an error occurred, if so, whether it was plain, whether it affected Johnson substantial rights, and whether it seriously affected the "fairness, integrity, or public reputation of the judicial proceedings." United States v. Askew, 403 F.3d 496, 503 (7th Cir. 2005).

A defendant is entitled to an instruction on a buyer-seller theory of defense in appropriate circumstances. The defense must be supported by law and have some foundation in the evidence. United States v. Irorere, 228 F.3d 816 (7th Cir. 2000). The line between conspiracy and a mere buyer-seller relationship "can be a blurry one." Askew, at 503. Courts must look at the context of the case to determine what the facts show and whether the instruction would be appropriate. Colon, 549 F.3d 565.

The context of this case indicates that the rejection of the instruction was not plain error. As we have discussed, Johnson, Ty, and Trice were coconspirators. They were all on the same side of the transactions. In addition, Johnson did not proceed at trial under a buyer-seller theory. He denied that he was a drug dealer at all.

Although despite his denial there was evidence at trial that Johnson sold drugs to some people who could be characterized as buyers only, the overriding context of this trial was that he and Ty worked together to obtain drugs for distribution. As in United States v. Johnson, 437 F.3d 665 (7th Cir. 2006), we find that the strength of the evidence of conspiracy coupled with the lack of a coherent buyer-seller defense means that the absence of the instruction was not plain error. In addition, it did not affect Johnson's substantial rights, and did not affect the fairness or integrity of the proceedings.

In fact, we are convinced that, were we to review this issue de novo (see United States v. Prude, 489 F.3d 873 (7th Cir. 2007), we would come to the same conclusion as the trial judge. The government objected to the instruction, saying that Johnson's defense was merely a general denial. Defense counsel's only response was that one person testified that Johnson was a buyer. He said nothing at all about selling drugs. That would not be

sufficient to convince us that the instruction was required.  Were we to review the issue <u>de novo</u>, we would uphold the rejection of the instruction.

Accordingly the judgment of conviction is AFFIRMED.